639 S.E.2d 36

**The STATE, Respondent,**

v.

**Martha BANDA, Appellant.**

**No. 26239.**

Supreme Court of South Carolina.

Heard Oct. 17, 2006.
Decided Dec. 11, 2006.

246

Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia, and Solicitor Robert M. Ariail, of Greenville, for Respondent.

Chief Justice TOAL:

In this case, the trial court denied Appellant Martha Banda's pre-trial motions to suppress evidence and an incriminating statement she gave to police. The trial court subsequently convicted Banda for trafficking in ten grams or more of methamphetamine and sentenced her to four years imprisonment.

## FACTUAL/PROCEDURAL BACKGROUND

In February 2003, Banda, a citizen of Zimbabwe,[1] was a passenger in a car stopped by the City of Greenville (Greenville) police for having stolen Georgia license tags. Earlier that evening, Greenville narcotics officers Detective Mark White (White) and Detective Melissa Lawson (Lawson) were staking out a house that a confidential informant had told them was the residence of a female drug target dealing methamphetamines, and for whom the officers had an arrest warrant. The confidential informant had arranged to purchase an "8-ball of meth" at the target's house. The informant further told police that the drugs came from a supplier in Georgia.

During the stakeout, the narcotics officers observed a car with Georgia license tags pull into the driveway of the target's residence and leave thirty to forty minutes later. Although White's testimony indicates that at this point, the officers were aware of the possibility that the deal between the confidential informant and the target had been called off, they followed the car assuming that the occupants might be going to meet with the informant anyway. As the officers continued to follow the vehicle, they realized there were two occupants: a male driver and a female passenger. White and Lawson testified that at this point, they assumed the female passenger to be their target. After learning from dispatch that the Georgia tags had been reported stolen, White and Lawson had another uniformed Greenville police officer assist them in stopping the car once it entered the city limits. Detective Conroy (Con-

---

1. Banda came to the United States on a basketball scholarship. She first attended a university in Oklahoma and later transferred to the University of South Carolina.

roy), another narcotics officer assisting in the investigation of the target, also came to the scene.

Upon stopping the car, the officers requested that both the driver and passenger step out of the car. Conroy and the uniformed officer attended to the driver and subsequently handcuffed and arrested him for driving with a stolen license plate. Meanwhile, White and Lawson approached Banda on the passenger side. Although the officers immediately realized Banda was not their target when she stepped out of the car, they proceeded to question her at the scene anyway.

Detective White had his gun drawn and pointed at Banda as Lawson asked her if she had any weapons.[2] Banda responded she did not, but Lawson explained to Banda she was going to do a routine pat down for Lawson's own safety. During the pat down, Lawson felt an object in Banda's upper right hand coat pocket. When Lawson asked Banda what it was, Banda explained that it was her ace bandage. At the same time, Banda pulled a "loosely rolled up" bandage out of the pocket and handed it to Lawson. Lawson squeezed the bandage and felt plastic on the inside. She looked at Banda who "dropped her head" and told Lawson it was an ounce of "ice." Lawson read Banda her *Miranda* rights at the scene and after a further search of the vehicle, the officers took Banda back to the station where they read her *Miranda* rights for a second time. After waiving her *Miranda* rights, Banda gave the officers a written statement.

Banda made a pre-trial motion to suppress the drugs found by Lawson on the grounds that Lawson's stop and frisk was an unreasonable search and seizure. After an in camera suppression hearing in which the trial court heard testimony from Banda and Detectives White and Lawson, the court denied Banda's motion to suppress the drugs. The trial court found the police had probable cause to stop the car for the stolen tags; they had the authority to request Banda to get out of the car; and that Banda was properly frisked for

---

**2.** Detective White testified that it is routine police department practice to have guns drawn for car stops related to narcotics investigations. Because the officers initially believed that Banda was their target, they adhered to this practice in approaching Banda during the stop.

weapons given the officers' reasonable suspicion of her involvement in the delivery of drugs.

Banda then made a second pre-trial motion to suppress her written statement made to the police after her arrest. Banda argued she had not been informed of her right to contact Zimbabwe's consular official as required by international treaty. The State did not deny this allegation.

The trial court found that even assuming the Greenville officers had violated the treaty, this violation did not provide adequate legal grounds to consider applying the exclusionary rule to Banda's statement. For this reason, the trial court refused to grant Banda a suppression hearing on the admissibility of her statement and denied her motion to suppress the statement. The trial court subsequently sentenced Banda to four years imprisonment.

This case was certified to this Court from the court of appeals pursuant to Rule 204(b), SCACR. Banda raises the following issues for review:

I. Did the trial court err in refusing to suppress the drugs found on Banda during a frisk for weapons pursuant to an automobile stop for a traffic violation?

II. Did the trial court err in refusing to grant a suppression hearing for Banda's written statement to police when police failed to notify the foreign consulate of Banda's arrest prior to interrogating her?

### STANDARD OF REVIEW

In criminal cases, an appellate court sits to review errors of law only. Therefore, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). The same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases. *State v. Wilson,* 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001). Our review in Fourth Amendment search and seizure cases is limited to determining whether any evidence supports the trial court's finding. *State v. Butler,* 353 S.C. 383, 389, 577 S.E.2d 498, 500 (2003).

LAW/ANALYSIS

## I. Suppression of Drugs

Banda argues that the trial court erred in refusing to suppress the drugs found in her coat during the automobile stop. We disagree.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Temporary detention of individuals by the police during an automobile stop constitutes a "seizure" of an individual within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Therefore, an automobile stop implicates the Fourth Amendment prohibition against unreasonable searches and seizures, imposing a standard of "reasonableness" upon the exercise of discretion by state law enforcement officials. *See id.* at 654, 99 S.Ct. 1391. The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 809–810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Notwithstanding multiple exceptions, evidence obtained by searches and seizures in violation of the Constitution is inadmissible in a state court. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

In this case, it is undisputed that Greenville police acted lawfully in stopping the car in which Banda was a passenger. The car displayed a stolen license tag, and the stop occurred within the Greenville city limits, which was within Greenville police jurisdiction.[3] Additionally, both parties acknowledge that the Greenville police were entitled to order Banda out of the car. *See Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (holding that a police officer may order both the driver and passenger out of the vehicle pursuant to a valid automobile stop without

---

3. We note that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 814, 116 S.Ct. 1769. Evidence that the Greenville officers were more interested in apprehending the drug target does not factor into a probable cause analysis in the otherwise valid stop of a vehicle for stolen license tags.

violating the Fourth Amendment prohibition against unreasonable seizures). However, Banda argues that Detective Lawson did not have reasonable suspicion to search her for weapons. For this reason, Banda contends the drugs recovered during the pat down should be suppressed.

■ Balancing the potential intrusion on an individual's Fourth Amendment rights with the need for law enforcement officers to protect themselves and other prospective victims of violence, the United States Supreme Court held in *Terry v. Ohio* that a police officer must have a reasonable suspicion that a person is armed and dangerous before conducting a pat down or frisk of that person. 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion" of weapons requires that a reasonably prudent person under the circumstances be warranted in the belief that his safety or that of others is in danger. *Id.* at 27, 88 S.Ct. 1868; *Butler*, 353 S.C. at 390, 577 S.E.2d at 501. The Supreme Court extended the *Terry* doctrine to frisks pursuant to valid automobile stops for traffic violations in *Pennsylvania v. Mimms*, 434 U.S. 106, 111–112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

■ We hold that under the circumstances of this case, Lawson had reasonable suspicion to frisk Banda for weapons pursuant to a valid automobile stop. This Court has recognized that because of the "indisputable nexus between drugs and guns," where an officer has reasonable suspicion that drugs are present in a vehicle [4] lawfully stopped, there is an appropriate level of suspicion of criminal activity and apprehension of danger to justify a frisk of both the driver and the passenger in the absence of other factors alleviating the officer's safety concerns. *Butler*, 353 S.C. at 391, 577 S.E.2d 498 (quoting *U.S. v. Sakyi*, 160 F.3d 164, 169–170 (4th Cir. 1998)). In this situation, the police clearly had reasonable suspicion to suspect that drugs were present in the vehicle. The police had observed the car leave the residence of a known drug dealer. Furthermore, the car displayed stolen

---

4. "Reasonable suspicion" in this context requires an officer to have "a particularized and objective basis," based on the totality of the circumstances, that would lead one to suspect that drugs are present in the vehicle lawfully stopped. *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *State v. Lesley*, 326 S.C. 641, 644, 486 S.E.2d 276, 277 (Ct.App.1997).

Georgia license tags and the police knew from their confidential informant that the target's drug shipments came from Georgia. Even though the police shortly realized that Banda was not their target, the fact that the activity observed at the target's house corroborated the informant's statements was enough to give the officers a reasonable suspicion that Banda was in some way involved with the target's drug activity and that drugs might therefore be in the vehicle. *See Cortez*, 449 U.S. at 417, 101 S.Ct. 690. Given the frequent association between drugs and guns, Lawson's safety concerns were justified based on the vehicle's apparent connection to a known drug dealer.

Banda compares her case to *State v. Butler* where this Court granted the defendant's motion to suppress drugs found in a frisk while he was a passenger in a vehicle stopped for having no taillights. 353 S.C. at 385, 577 S.E.2d at 499. We find, however, that *Butler* is distinguished given that the frisk in that case occurred as a part of the officer's continuing investigation of a possible open-container violation. *Id.* at 392; 577 S.E.2d at 503. The Greenville police had what the officer in Butler did not; that is, a reasonable suspicion that the suspect was armed and dangerous. Their reasonable suspicion arose directly from the presumption of weapons when there is reasonable suspicion that drugs are present. *See id.* at 391, 577 S.E.2d at 502.

Accordingly, we hold that the trial court properly determined the officer's frisk for weapons was appropriate under *Terry v. Ohio* and did not violate the Fourth Amendment prohibition on unreasonable searches and seizures.

## II. Suppression of Appellant's Statement

 Banda argues that the trial court erred in refusing to grant a *Jackson v. Denno*[5] hearing on the admissibility of her statement to the police because the statement was taken in violation of an international treaty. This is an incorrect statement of the issue.

---

5. *Jackson v. Denno* held that a defendant in a criminal case was entitled to an evidentiary hearing on the voluntariness of statements made by the defendant prior to submission of such statements to a jury. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

At trial, Banda moved for an in camera suppression hearing for her statement to police on the grounds that police obtained the statement in violation of an international treaty. The motion, as Banda presented it, did not involve a determination of the voluntariness of the statement: Banda neither specifically requested a *Jackson v. Denno* hearing, nor did she otherwise support the motion with facts showing that the statement was involuntary.[6] Banda's claim that the trial court erred by refusing to grant her a *Jackson v. Denno* hearing is therefore not properly before the Court on appeal because the grounds now asserted are not supported by the motion made at trial. *See State v. Silver*, 314 S.C. 483, 487, 431 S.E.2d 250, 252 (1993) (holding that the court of appeals improperly treated the trial court's denial of an in camera hearing on the issue of whether defendant was in custody and entitled to *Miranda* warnings as the denial of a *Jackson v. Denno* hearing on the voluntariness of defendant's statement).

A more accurate statement of the issue preserved to this Court is whether the trial court erred by refusing to grant Banda an in camera suppression hearing on the admissibility of her statement to police based upon a violation of a bilateral consular convention between the United States and the United Kingdom[7] (the U.K. Convention) requiring consular notification when foreign nationals are detained.

This is not the first time that South Carolina courts have analyzed the effects of international treaties on South Carolina

---

6. Banda did not dispute the validity of the *Miranda* warnings or her signed waiver. Moreover, the State pointed out that Banda was college-educated and was not intoxicated that evening.

7. Banda based her motion to suppress the statement to police on the alleged violation of a consular notification provision in Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 [hereinafter Vienna Convention]. This contention is incorrect. Domestic law enforcement's obligation to notify Zimbabwe's foreign consulate does not come under the Vienna Convention, but rather, falls under Article 16 of a bilateral consular convention between the United States and the United Kingdom of Great Britain and Northern Ireland [no long-title in original], U.S.-U.K., June 6, 1951, 3 U.S.T. 3426, T.I.A.S. No. 2494 [hereinafter U.K. Convention]. *See also* U.S. DEPARTMENT OF STATE, INFORMATION FOR AMERICANS ABROAD, CONSULAR NOTIFICATION AND ACCESS, PART5: LEGAL MATERIAL, http://travel.state.gov/law/consular/consular_744.html.

law. In *State v. Lopez,* the court of appeals addressed the consular notification provision in Article 36 of the Vienna Convention.[8] 352 S.C. 373, 574 S.E.2d 210 (2002). In *Lopez,* the trial court denied the defendant's motion to withdraw his guilty plea where the State did not inform him of his consular notification rights under Article 36. The defendant claimed that had he known of his rights, he would have obtained the services of a translator from the Mexican Consulate to assist him during his guilty plea hearing. Although the Supremacy Clause of the United States Constitution provides that treaties to which the United States is a party take precedence over any state law, the court of appeals noted that the rights created in international treaties did not create rights equivalent to constitutional rights. *Id.* at 381, 574 S.E.2d at 214. Therefore, the defendant had to establish prejudice to prevail on his claim. *Id.* On these principles, the court of appeals affirmed the circuit court, observing that because the defendant had rejected the trial judge's offers to provide him a translator, any prejudice suffered by the defendant from his failure to have a translator's assistance during the guilty plea hearing resulted from his own actions. *Id.* at 383, 574 S.E.2d at 215.

Recently, the United States Supreme Court addressed Article 36 of the Vienna Convention and its role in state judicial proceedings with respect to triggering the exclusionary rule. In *Sanchez–Llamas v. Oregon,* 548 U.S. ——, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006), the court held that suppression of evidence was not an appropriate remedy for violations of Article 36 of the Vienna Convention for a number of reasons. First, the court observed that the Vienna Convention did not mandate suppression or any other remedy for its violations, but rather left Article 36's implementation to domestic law. 548 U.S. at ——, 126 S.Ct. at 2678 (quoting Art. 36(2), 21 U.S.T. at 101). Furthermore, the court declared that it did not hold a supervisory authority over state courts that would permit it to develop remedies for the enforcement of federal law in state court criminal proceedings. *Id.* at ——, 126 S.Ct. at 2679. Without this power, the court reasoned that it could not direct the state courts to apply the exclusionary rule

---

8. Art. 36(1)(b), 21 U.S.T. at 101.

unless required to do so by the Vienna Convention itself (pursuant to the Supremacy Clause). Lastly, the court stated that even if Article 36 implicitly required some judicial remedy for its violation (as Sanchez–Llamas claimed), the exclusionary rule would not be appropriate. The court noted that the exclusionary rule's primary function was to deter constitutional violations. Article 36, in contrast, only secured the right to *inform* the foreign consulate of an arrest or detention; it did not guarantee any sort of consulate intervention or termination of investigation pending notice to or intervention by the consulate. *Id.* at ——, 126 S.Ct. at 2681. With respect to interrogations, the court specifically stated that there was likely to be little connection between an Article 36 violation and statements obtained by police. *Id.* Suppression, it concluded, "would be a vastly disproportionate remedy for an Article 36 violation." *Id.*

■■■■■ Turning to the instant case, we hold that the trial judge properly refused to grant Banda a suppression hearing on the admissibility of her statements to police. Whenever evidence is introduced that was allegedly obtained by conduct violative of the defendant's constitutional rights, the defendant is entitled to have the trial judge conduct an evidentiary hearing out of the presence of the jury to establish the circumstances under which the evidence was seized. *State v. Patton,* 322 S.C. 408, 411, 472 S.E.2d 245, 247 (1996) (citing *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908). To be entitled to a suppression hearing, a defendant must articulate specific factual and legal grounds to support his claim that evidence was obtained by conduct violative of his constitutional rights. *Id.* at 411–412, 84 S.Ct. 1774, 472 S.E.2d at 247. In making this determination, the trial court shall take into account the totality of the circumstances and may eliminate those issues not raising a question of constitutionality while confining the hearing to those which have arguable merit. *Id.* at 412, 472 S.E.2d at 247.

■■■■■ Banda's only factual ground for her motion—correctly stated—is that police violated the U.K. Convention by not informing her of her right to notify Zimbabwe's foreign consulate. Federal and state case law indicate this does not provide a valid legal ground on which to base her suppression

claim. Because the Vienna Convention's consular notification provision is nearly the same as that in the U.K. Convention, the legal analyses in *Lopez* and *Sanchez–Llamas* apply equally to Article 16 of the U.K. Convention.[9] Like the Vienna Convention, the U.K. Convention does not mandate suppression or any other remedy for its violations.[10] Additionally, because international treaties do not create rights equivalent to constitutional rights, *Lopez*, 352 S.C. at 381, 574 S.E.2d at 214, the violation of the consular notification provision does not, on its own, justify applying the exclusionary rule as a remedy. *See Sanchez–Llamas*, 548 U.S. at ——, 126 S.Ct. 2669, 165 L.Ed.2d 557. Because the U.K. Convention only secures the right to *inform* the foreign consulate of a detention—and not the right to consular *intervention*—the violation of the U.K. Convention's consular notification provision would have little connection with a defendant's statement to police.[11] *See id.* at ——, 126 S.Ct. at 2681.

---

9. Article 16 of the U.K. Convention reads in relevant part:

(1) A consular officer shall be informed immediately by the appropriate authorities of the territory when any national of the sending state *is confined in prison awaiting trial or is otherwise detained in custody within his district.* A consular officer shall be permitted to visit without delay, to converse privately with and to arrange legal representation for, any national of the sending state who is so confined or detained....

Art. 16(1), 3 U.S.T. 3426.

Article 36 of the Vienna Convention reads in relevant part:

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, *within its consular district, a national of that State is arrested or* committed to prison or to custody pending trial or is detained in any other manner.... The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;....

Art. 36(1)(b), 21 U.S.T. at 101.

10. The U.K. Convention does not have a provision analogous to Article 36(2) of the Vienna Convention which specifically leaves implementation of rights in the Vienna Convention to state law. At the same time, it has no provisions that suggest it should be implemented otherwise. *See* 21 U.S.T. 3426.

11. Interestingly, the *Sanchez–Llamas* opinion made a brief mention of other ways to vindicate a defendant's Vienna Convention rights, including raising an Article 36 claim "as part of a broader challenge to the voluntariness of his statements to police." *Id.* at 2682. We interpret this suggestion as indicating that a defendant may successfully move for a *Jackson v. Denno* hearing to suppress a statement by asserting a

With no other legal grounds in support of her motion to suppress her statement, applying the exclusionary rule to remedy the treaty violation would be "vastly disproportionate" to any wrong suffered by Banda. Accordingly, the trial court did not err in denying Banda a suppression hearing on the admissibility of her statement to police.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.

violation of the consular notification provisions of a treaty, *along with other factors* indicating the involuntariness of a statement (such as the failure to receive *Miranda* rights).