**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Erick E. Hewins, Appellant.

Appellate Case No. 2013-000224

Appeal From Greenville County
G. Edward Welmaker, Circuit Court Judge

Unpublished Opinion No. 2014-UP-478
Heard November 6, 2014 – Filed December 23, 2014

**AFFIRMED**

Jessica Hanna Lerer, Strom Law Firm, LLC, of
Lexington, and Chief Appellate Defender Robert Michael
Dudek, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Mary Shannon Williams, both of
Columbia; and Solicitor William Walter Wilkins, III, of
Greenville, for Respondent.

**PER CURIAM:** The State indicted Erick E. Hewins for trafficking ten grams or more of crack cocaine and possession of a schedule IV controlled substance.

Before trial, Hewins moved to suppress the drug evidence, arguing the detention and subsequent pat-down was unlawful under the Fourth Amendment. The trial court denied his motion after a hearing. During trial, Hewins objected to the admission of the drug evidence pursuant to Rule 6 of the South Carolina Rules of Criminal Procedure, arguing the chain of custody was incomplete. The trial court denied the motion, and the jury found Hewins guilty as indicted. On appeal, Hewins raises four issues to this court: (1) the police lacked reasonable suspicion to detain him; (2) the police did not have a reasonable belief he was armed and dangerous to justify the pat-down or (3) a second reach into his pocket; and (4) the State did not properly identify, by testimony or sworn statement, either the initial evidence custodian responsible for retrieving the drug evidence or the condition of the evidence. We affirm.

On the night of Hewins' arrest, Officers Scott Gardner and Rachel Hall of the Greenville City Police Department's aggressive patrol unit drove into the parking lot of the Clarion Inn. At the suppression hearing, Gardner testified the location was "a very high crime area with drugs and prostitution and break-ins" where Gardner had personally dealt with "multiple drug trafficking cases and numerous prostitution cases." The officers observed Hewins in a black Lexus backed into a parking spot next to a Camry "with two young females inside it." Hewins and the women were parked "driver's side to driver's side window" and "appeared to have a meeting for some reason." No other cars were near the Lexus and Camry. Gardner pulled the unmarked patrol vehicle to the middle of the lane in the parking lot, near the Lexus and Camry, "for officer safety purposes"—the parking lot was not well lit and "[a]t the time, the only lights in the parking lot came from the [Clarion Inn] building."

Gardner and Hall exited their vehicle and identified themselves as police officers as they approached Hewins and the two women. Gardner positioned himself between the Lexus and Camry so he could see Hewins—from behind—on one side and the two women on the other. All three individuals "appeared to be very nervous almost instantaneously" and stopped talking to each other. Gardner asked what they were doing in the parking lot and for their identification—"the young ladies had their ID, Mr. Hewins did not." When Gardner asked Hewins what he was doing at the Clarion Inn, Hewins responded he was there "to see his baby mama in room [237]." When Gardner asked for that person's name, Hewins told Gardner "he didn't know her name." Hewins "was stuttering when he was speaking," "began to get increasingly nervous," and "began sweating profusely."

Hall ran a database check on the three of them.[1]  Hall received responses for the women but had "trouble getting [Hewins'] information back."  Gardner then called for backup.

Gardner testified Hewins "continually touched his left pocket.  And he continued to touch the pocket.  And . . . he tried to place his hand in his left pocket."  Gardner stated, for his own safety, he asked Hewins to stop moving his hands and to leave his left pocket alone.  Gardner testified Hewins' hand motions could be "a big indicator that an individual either has weapons or that they have contraband or drugs inside their pocket.  It's something that a lot of individuals, that we learn through our training, do unconsciously or consciously."  Hewins continued to touch his pocket after being asked not to do so.

When backup arrived, Gardner asked Hewins to get out of the Lexus.  Gardner informed Hewins that he "was going to conduct a *Terry*[2] frisk on his person for weapons on the outside of his clothing."  Gardner conducted a pat-down, "felt a hard lump inside of his [left] pocket," and asked Hewins what the lump was.  Hewins did not respond, and Gardner then "asked [Hewins] if [he] could have consent to place [his] hand inside [Hewins'] pocket."  Gardner stated he received Hewins' consent and Gardner found "a large wad of cash rolled up in rubber bands."[3]  Hewins "didn't know" why he had such a large amount of money on his person and told Gardner he did "this and that" to make a living.  Apparently without any further inquiry or notice, Gardner then reached into Hewins' pocket a second time.  Gardner stated:

> Due to the fact that I couldn't full clear his pocket due to
> this large lump, and then also still having his consent, I
> reached back into his pocket to clear the rest of the items
> out because there could possibly still have been a weapon
> underneath the large lump.  And it was four green round

---

[1]  Hall testified that prior to running the check she noticed Hewins was stuttering and that "he continuously, it was like almost grabbing or pinching at his left pocket.  He continuously touched his pocket."

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

[3] Gardner did not testify if Hewins' consent was verbal or non-verbal.

pills, which were confirmed to be clonazepam, which is a Schedule IV drug.[4]

After finding the pills, Gardner arrested Hewins and called a tow truck for Hewins' car. Pursuant to policy, officers "conduct[ed] an inventory search of the vehicle for valuables or weapons or other contraband." During the search of Hewins' car, Gardner found "a large piece of crack in the -- on the back floorboard, approximately eighteen to twenty grams" and "an Advil bottle in the center console with multiple small crack rocks inside." Another officer assisting with the search found a silver scale in a duffle bag in the trunk of the car.

We find there is evidence to support the trial court's finding that Gardner had reasonable suspicion to justify the stop. *See State v. Taylor*, 401 S.C. 104, 108, 736 S.E.2d 663, 665 (2013) (stating "[a] trial court's Fourth Amendment suppression ruling must be affirmed if supported by any evidence"). As this court has stated, "[I]t is entirely appropriate for courts to credit the practical experience of officers who observe on a daily basis what transpires on the street." *State v. Wallace*, 392 S.C. 47, 52, 707 S.E.2d 451, 453 (Ct. App. 2011) (quoting *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008) (internal quotation marks omitted)). Gardner, who had two and a half years of law enforcement experience with the aggressive patrol unit, possessed personal knowledge of the area in which Hewins was detained and its association with "drugs and prostitution and break-ins." *See United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (stating "an area's propensity toward criminal activity is something an officer may consider" in determining the existence of reasonable suspicion, which includes personal knowledge that an area "ha[s] a large amount of drug traffic"). Specifically, Gardner had personally "made multiple drug trafficking cases and numerous prostitution cases in that area." *See State v. Corley*, 383 S.C. 232, 242, 679 S.E.2d 187, 192 (Ct. App. 2009), *aff'd as modified*, 392 S.C. 125, 708 S.E.2d 217 (2011) (relying on defendant being at a "*known* drug house where several cases had been made and search warrants executed" to find reasonable suspicion existed). In addition, Gardner testified his suspicion of drug activity and prostitution was raised based upon the orientation of the Lexus and Camry in the Clarion Inn's empty and dimly-lit parking lot at a late hour with no evidence the occupants were

---

[4] Gardner testified, based upon his training, that weapons "can be of a small size and be hidden anywhere." Specifically, Gardner testified the weapon "could be a small Derringer, it could be a razor blade, it could be anything that small. It could be anything that could hurt you . . . ."

"attempting to exit [their] vehicles." Finally, Gardner testified that when he identified himself as a police officer Hewins "was stuttering when he was speaking," "began to get increasingly nervous," and "began sweating profusely." Hall corroborated this, stating, "[Hewins] was nervous and . . . he was stuttering. He was looking around instead of looking at us while we were speaking to him." Considering this evidence in combination, we believe it supports the trial court's finding that reasonable suspicion existed to detain Hewins. *See State v. Khingratsaiphon*, 352 S.C. 62, 69, 572 S.E.2d 456, 459 (2002) ("In determining whether reasonable suspicion exists, 'the totality of the circumstances—the whole picture—'must be considered." (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981))).

We also find there is evidence to support the trial court's finding that Gardner had a reasonable belief Hewins was armed and dangerous to justify the pat-down. Subsequent to a valid *Terry* stop, a police officer may conduct a pat-down of an individual for weapons when "the officer has reason to believe the person is armed and dangerous." *Khingratsaiphon*, 352 S.C. at 69, 572 S.E.2d at 459. "In assessing whether a suspect is armed and dangerous, '[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" 352 S.C. at 70, 572 S.E.2d at 459 (alteration in original) (quoting *Terry*, 392 U.S. at 27). Our supreme court has recognized that because of the "indisputable nexus between drugs and guns," when an officer has reasonable suspicion that drugs are present, "there is an appropriate level of suspicion of criminal activity and apprehension of danger" to justify a pat-down of an individual. *State v. Banda*, 371 S.C. 245, 253, 639 S.E.2d 36, 40 (2006).

When Gardner asked Hewins what he was doing at the Clarion Inn, Hewins responded he was there to see his child's mother in Room 237. When Gardner asked for the name of his child's mother, Hewins told Gardner he did not know her name. Gardner and Hall testified they observed Hewins touching his left pocket while he was inside of his car, and Gardner stated Hewins continued to touch the pocket after being asked not to do so. Gardner asked Hewins to exit his vehicle, and Gardner performed the pat-down in search of weapons, "I advised [Hewins] I was going to conduct a *Terry* frisk on his person for weapons on the outside of his clothing."[5] Given (1) "the frequent association between drugs and guns," 371 S.C.

---

[5] The trial court made no definitive ruling as to the time the detention began, but it likely occurred when Gardner asked Hewins to exit his vehicle.

at 254, 639 S.E.2d at 41, (2) the fact that Gardner and Hall testified Hewins continually touched his left pocket before the pat-down occurred, and (3) Gardner's belief Hewins may have possessed weapons, we find it was reasonable for Gardner to conduct the pat-down based on concerns for his own safety, as well as the safety of the other officers on-site.

We also find there is evidence to support Gardner's first reach into Hewins' pocket. When Gardner "began to pat [Hewins] down . . . on his left-side pocket where he'd been touching, [Gardner] felt a hard lump inside of his pocket."  Gardner asked Hewins what the lump was and Hewins did not respond.  If Gardner had reasonable suspicion the lump was contraband, he was justified in reaching into the pocket to retrieve it.  *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (holding "police officers may seize nonthreatening contraband detected during a protective patdown search . . . permitted by [and within the bounds of] *Terry*"). However, we need not determine whether Gardner had reasonable suspicion to believe the lump was contraband because Gardner testified he received Hewins' consent to reach into the pocket.  *See State v. Bailey*, 276 S.C. 32, 35-36, 274 S.E.2d 913, 915 (1981) (recognizing consent as an exception to the Fourth Amendment's warrant requirement).  Gardner discovered a "large wad of cash rolled up in rubber bands" inside the pocket.

Finally, we address the issue of Gardner having Hewins' continuing consent to reach into the pocket a second time.  After Gardner retrieved the wad of cash from Hewins' pocket he asked Hewins why he had such a large amount of money and Hewins said "he didn't know."  Gardner asked Hewins what he did for a living and Hewins answered "this and that."  Gardner then reached into the pocket a second time—"still having [Hewins'] consent"—because there could have been a weapon under the wad of cash.  Gardner discovered the four pills of clonazepam, which led to Hewins' arrest.  "When relying on the consent of a suspect, a police officer's search must not exceed the scope of the consent granted or the search becomes unreasonable."  *State v. Forrester*, 343 S.C. 637, 648, 541 S.E.2d 837, 843 (2001). If Gardner had Hewins' consent to conduct the first reach into the pocket, the scope of the consent granted could have been limited to determining what the lump in Hewins' pocket was.  Thus, the second reach into Hewins' pocket might have exceeded the scope of consent.  The trial court did not make any finding as to whether the scope of consent included the second reach into Hewins' pocket.  In addition, we are troubled by Gardner's bare assertion that he received consent for the second reach to justify his actions.  *See Johnson v. United States*, 333 U.S. 10, 13-14 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual

inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").

While we believe the facts raise the question of whether Gardner's second reach was justified by consent, we find the issue is not preserved. When Gardner was cross-examined during the suppression hearing, he reiterated his assertion that he had Hewins' consent to reach into the pocket the first time to retrieve the "hard lump." Hewins made no inquiry as to Gardner's testimony that he had Hewins' continuing consent to conduct the second reach. Hewins did not object to the State's argument that Gardner's first reach was justified under *Terry* and by Hewins' consent and that the second reach was justified by continuing consent. Finally, while Hewins supported his suppression argument by asserting a reasonable person with drugs in their pocket and car would not give consent, he did not object to the trial court's general ruling on admissibility or seek a specific ruling on the issue of consent for the second reach. Therefore, we find the issue is not preserved for review on appeal. *See State v. Brockmeyer*, 406 S.C. 324, 336 n.8, 751 S.E.2d 645, 651 n.8 (2013) ("Because the trial court did not rule on this argument, it is not preserved for appellate review and we do not reach it."); *State v. McLaughlin*, 307 S.C. 19, 23, 413 S.E.2d 819, 821 (1992) (holding the appellant's failure to request a more explicit ruling constituted a waiver to any objection to the trial court's general ruling); *State v. Passmore*, 363 S.C. 568, 584, 611 S.E.2d 273, 282 (Ct. App. 2005) ("Without an initial ruling by the trial court, a reviewing court simply would not be able to evaluate whether the trial court committed error." (citation and internal quotation marks omitted)).

As to whether the trial court erred in admitting the drug evidence over Hewins' Rule 6, SCRCrimP, objection, we affirm pursuant to Rule 220(b), SCACR, and the following authority: *State v. Hatcher*, 392 S.C. 86, 91, 708 S.E.2d 750, 753 (2011) ("The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." (citation and internal quotation marks omitted)); *id.* ("An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." (citation and internal quotation marks omitted)); 392 S.C. at 95, 708 S.E.2d at 755 ("The State need not establish the identity of every person handling fungible items in all circumstances; rather, the standard is whether, in the discretion of the trial judge, the State has established the chain of custody as far as practicable.").

**AFFIRMED.**

**FEW, C.J., and KONDUROS and LOCKEMY, JJ., concur.**