SHORT, J.:
**476 Teresa Davis appeals her convictions of first-degree burglary and possession with intent to distribute (PWID) methamphetamine, second offense, for which the trial court sentenced her to a cumulative term of eighteen years' imprisonment. On appeal, Davis argues the trial court erred by (1) denying Davis's motion to sever her charges, (2) refusing to direct a verdict of acquittal when the State failed to present evidence showing Davis had control over the drugs found in the vehicle, and (3) refusing to direct a verdict of acquittal because the State failed to introduce any direct or substantial circumstantial evidence that the home was occupied, for the purposes of qualifying as a dwelling, at the time of the alleged burglary. We affirm.
**477 FACTS
As he was driving to work on February 10, 2014, Douglas Paul noticed a strange car in the driveway of his mother's home. Paul testified his mother suffered from Alzheimer's disease and had moved to a nursing home in the area about six months prior. His mother had given him a power of attorney, and he placed her home on the market but maintained and cared for the property, usually stopping by at least once a week. Not recognizing the car, Paul stopped at the house and looked around the property. After finding the car empty, Paul approached the house and found the front door was still locked. He walked to the garage door, which was still closed. Peering through the garage window, Paul noticed the door adjoining the house and garage was open. Suspecting an intruder, Paul called his wife and asked her to bring the key to the house as well as his handgun.[1] Once his wife arrived, Paul entered the home through the front door and noticed the glass sliding door at the back of the house was open. Hearing a noise upstairs, Paul shouted, "I know somebody is here. You know, whoever you are, you need to answer me." Paul also warned the intruder he was armed with a handgun. Paul exited the house and called the police because the noise from upstairs became clangorous, sounding as if "someone was tossing furniture." About eight to ten officers responded to the scene at various points throughout the day and most were in uniform. Officer George Mayer was the first to respond. Paul's wife informed Mayer she saw a man, who looked out of place, walking down the street. Mayer located the man and placed him in investigative detention in a squad car at the scene. Mayer identified the man as Ted Davis ("Brother"). Mayer searched Brother, finding a pair of work gloves in his boot as well as a white substance and glass pipe adjacent to his person.[2]
After a sweep of the scene, the police did not find anyone within the home or on the property. Paul walked through the home with the police, finding various doors, cabinets, and **478 closets open throughout the home and garage, as well as an open window in the master bathroom located on the back part of the roof. Paul testified many of his mother's antiques and jewelry were collected in piles throughout the home. The police found a latex glove on the floor in the garage.
The police completed an inventory of the vehicle in the driveway, finding a purse and a small plaid bag next to each other in the driver's seat. Inside the purse, the police *427 found Teresa Davis's South Carolina driver's license, lip balm, and some paperwork. The smaller plaid bag contained money, a digital scale, tissue paper, little baggies, a spoon, and a metal tin that contained two bags containing a crystal-like substance. The police also found mail in the back of the car behind the driver's seat. The mail was addressed to Davis, and the address matched the one on her driver's license. After running the license plate tag on the car, the police found it was registered to Lavina Davis.
After inventorying the vehicle, the police suspected another person may still be on the property. As some officers were walking along the back of the house, they spotted Teresa Davis crouching on the roof behind the chimney. As the police assisted Davis down from the chimney, a glass pipe rolled down the roof. The police placed Davis in investigative detention and read her Miranda[3] rights to her. After waiving her rights, Davis told police she was at the home because she was dropping off her friend Joe Mann. Davis further explained she hid on the roof because she was frightened. When asked why she remained on the roof for hours while the police were investigating, Davis did not respond.
When the police inquired about the drugs found in the car, Davis admitted the drugs were hers, stating, "That's mine. My brother doesn't do that." The police then placed Davis under arrest for PWID methamphetamine, after which Davis recanted her confession.[4] While conducting a search of Davis's person, the police found gloves and a flashlight in her jacket **479 pocket. A grand jury indicted Davis for first-degree burglary and PWID methamphetamine, second offense.
At the beginning of trial, Davis moved to sever her charges, arguing the offenses were not closely related in kind or character. The trial court denied Davis's motion, finding both charges required the same witnesses.
During trial, Paul testified his mother lived in the home for thirty-seven years before moving to a nursing home in the area for medical reasons. Paul explained as his mother's attorney in fact, he placed the home on the market because the future was uncertain; however, it was the family's hope that she would be able to return to the home at some point. Paul testified either he or his wife checked on the home every "two to three days." Paul testified all of his mother's furniture, as well as some of her clothing, remained in the home. Paul also testified he and his wife stopped by the home a couple days before the incident, and they left the home with all the doors and windows closed and locked. Paul specified he kept "big, round wooden sticks" in the sliding glass doors that had to be removed from inside the house to open the doors. Paul testified the utilities were still on in the home. Paul testified he was "a hundred percent certain" he did not leave the bathroom window open, and for it to be opened, someone would have to open both the window and the outer storm window. Paul noted it was cold and the heat was on in the house, so neither he nor his wife would have left any doors or windows open. On cross-examination, Paul admitted the home was on the market at the time of the incident. Paul testified his mother had not returned to the residence since moving to the nursing home, and he did not stay at the home because he lived within walking distance.
The trial court recognized Meredith Landford as an expert in forensic chemistry. Landford testified that after testing the amounts found in the plaid bag, she ascertained the first bag contained 4.61 grams of methamphetamine and the second bag contained 2.63 grams of methamphetamine. Investigator William Freestate testified the items found within the plaid bag, such as the digital scale, spoon, and baggies, indicated the methamphetamine was for distribution rather than personal use. Additionally, Patrick Wagner, an evidence technician for **480 the sheriff's office, testified he recovered one latent print from the home, and it did not match Davis's prints. *428 At the close of the State's case, the trial court instructed the jury the parties stipulated Davis had two prior burglary convictions. Davis moved for a directed verdict on the first-degree burglary charge, arguing the State failed to show there was an "occupant or inhabitant against whom the offense could have been committed"; therefore, the home did not qualify as a dwelling for purposes of first-degree burglary. Specifically, Davis asserted the vacant house was on the market and neither the owner nor Paul resided therein. The State argued all of Paul's mother's furniture remained in the home, and she would have returned to the home had her condition improved. The State further noted the family only placed the home on the market as a precautionary measure. The trial court denied Davis's motion, finding it was a question for the jury whether the home constituted a dwelling as provided by statute.
Additionally, Davis moved for a directed verdict on the PWID charge, arguing the State failed to show she had control over the drugs found in the car because the police found her on the roof of the home. In response, the State contended it presented circumstantial evidence showing the drugs were in Davis's control because the police found the methamphetamine in a bag next to Davis's purse in a car that she admitted to driving. The trial court denied Davis's motion, finding it was a question for the jury whether Davis had control or possession of the drugs.
At the close of trial, the jury found Davis guilty of both charges as indicted. The trial court sentenced Davis to concurrent terms of eighteen years' imprisonment on each charge. This appeal followed.
STANDARD OF REVIEW
"In criminal cases, an appellate court sits to review errors of law only. Therefore, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous." State v. Banda , 371 S.C. 245, 251, 639 S.E.2d 36, 39 (2006). Thus, "this [c]ourt is limited to determining whether the trial court abused its discretion." State v. Edwards , 384 S.C. 504, 508, 682 S.E.2d 820, 822 (2009). Accordingly, "[t]his [c]ourt does not re-evaluate the facts based on its own view of **481 the preponderance of the evidence but simply determines whether the trial court's ruling is supported by any evidence." Id.
LAW/ANALYSIS
I. Severance of Charges
Davis argues the trial court abused its discretion in failing to sever the first-degree burglary and PWID methamphetamine charges. Davis maintains the methamphetamine found in the car was unrelated to the burglary and the charges did not require proof by the same evidence. Davis contends her charges were not related in kind or character and she suffered prejudice from the joinder of these charges. We disagree.
"A motion for severance is addressed to the sound discretion of the trial court." State v. Rice , 368 S.C. 610, 613, 629 S.E.2d 393, 394 (Ct. App. 2006). "The trial court's ruling will not be disturbed on appeal absent an abuse of that discretion." Id. "An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law." Id. at 613, 629 S.E.2d at 395.
"The appellate court considers several factors when deciding whether the trial court's consolidation of charges was proper." Id. at 614, 629 S.E.2d at 395. "[J]oinder of offenses in one trial is 'proper if the offenses (1) are of the same general nature or character and spring from the same series of transactions, (2) are committed by the same offender, and (3) require the same or similar proof.' " State v. Simmons , 352 S.C. 342, 351, 573 S.E.2d 856, 861 (Ct. App. 2002) (quoting State v. Carter , 324 S.C. 383, 386, 478 S.E.2d 86, 88 (Ct. App. 1996) ). "Offenses are considered to be of the same general nature where they are interconnected." Id. at 350, 573 S.E.2d at 860. "Where the offenses charged in separate indictments are of the same general nature involving connected transactions closely related in kind, place and character, the trial [court] has the power, in [its] discretion, to order the indictments tried together if the defendant's substantive rights would not be prejudiced." Rice , 368 S.C. at 614, 629 S.E.2d at 395. "[O]ffenses which are of the *429 same nature, but which do not arise out of a single chain of circumstances and are not **482 provable by the same evidence may not properly be tried together." Id.
In the instant case, the joinder of Davis's first-degree burglary and PWID methamphetamine offenses was proper. Although a grand jury issued two indictments against Davis, her arrest for PWID methamphetamine arose out of the police's inventory of the car at the scene of the burglary investigation. Therefore, Davis's offenses originated from the same chain of events and required the same witnesses. See id. ("Where the offenses charged in separate indictments are of the same general nature involving connected transactions closely related in kind, place and character, the trial [court] has the power, in [its] discretion, to order the indictments tried together if the defendant's substantive rights would not be prejudiced."); Simmons , 352 S.C. at 351, 573 S.E.2d at 861 (quoting Carter , 324 S.C. at 386, 478 S.E.2d at 88 ("[J]oinder of offenses in one trial is 'proper if the offenses (1) are of the same general nature or character and spring from the same series of transactions, (2) are committed by the same offender, and (3) require the same or similar proof.' ") ). Accordingly, we find Davis suffered no prejudice and the trial court did not abuse its discretion in refusing to sever the indictments.
II. Directed Verdict
"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." State v. Weston , 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "A defendant is entitled to a directed verdict when the state fails to produce evidence of the offense charged." Id. "On appeal from the denial of a directed verdict in a criminal case, an appellate court must view the evidence in the light most favorable to the State." State v. Stanley , 365 S.C. 24, 41, 615 S.E.2d 455, 464 (Ct. App. 2005). "If there is any direct or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find that the issues were properly submitted to the jury." State v. Mollison , 319 S.C. 41, 46, 459 S.E.2d 88, 91 (Ct. App. 1995). "Nevertheless, a[n appellate] court is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." State v. Bennett , 415 S.C. 232, 236, 781 S.E.2d 352, 354 (2016). "[T]he lens through which a[n **483 appellate] court considers circumstantial evidence when ruling on a directed verdict motion is distinct from the analysis performed by the jury." Id. "Accordingly, in ruling on a directed verdict motion where the State relies on circumstantial evidence, th[is] court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt." Id. at 237, 781 S.E.2d at 354.
A. PWID Methamphetamine
Davis argues the trial court erred in denying her motion for a directed verdict because the State failed to introduce any direct or substantial circumstantial evidence that she actually or constructively possessed the methamphetamine found in the vehicle at the scene of the burglary. We disagree.
In South Carolina, it is illegal for a person to "knowingly or intentionally" possess methamphetamine. See S.C. Code Ann. § 44-53-370(c) (2018). Subsection 44-53-375(B) of the South Carolina Code (2018) provides:
A person who manufactures, distributes, dispenses, delivers, purchases, or otherwise aids, abets, attempts, or conspires to manufacture, distribute, dispense, deliver, or purchase, or possesses with intent to distribute, dispense, or deliver methamphetamine ... is guilty of a felony.... Possession of one or more grams of methamphetamine ... is prima facie evidence of a violation of this subsection.
"Possession of any amount of controlled substance coupled with sufficient indicia of intent to distribute will support a conviction for possession with intent to distribute." State v. James , 362 S.C. 557, 561-62, 608 S.E.2d 455, 457 (Ct. App. 2004). Possession may be actual or constructive. See Mollison , 319 S.C. at 45, 459 S.E.2d at 91. "Actual possession occurs when the drugs are found to be in the actual physical custody of the person charged with *430 possession." Stanley , 365 S.C. at 42, 615 S.E.2d at 464. "Mere presence is insufficient to prove constructive possession." State v. Heath , 370 S.C. 326, 329, 635 S.E.2d 18, 19 (2006). "In order to prove constructive possession, the State must show the defendant had dominion and control, or the right to exercise dominion and control, over **484 either the drugs or the premises upon which the drugs are found." Stanley , 365 S.C. at 42-43, 615 S.E.2d at 464. "Such possession can be established by circumstantial or direct evidence or a combination of the two." Id. at 43, 615 S.E.2d at 464-65.
Here, the police inventoried the vehicle as part of their investigation of the burglary of the Paul home. A purse and a smaller plaid bag sat on the driver's seat. Inside the purse, the police found Davis's South Carolina driver's license, lip balm, and some paperwork. The smaller plaid bag contained money, a digital scale, tissue paper, little baggies, a spoon, and a metal tin in which there were two bags containing a crystal-like substance. When the police located Davis on the roof, a glass pipe rolled down from where she was hiding. Further, after waiving her Miranda rights, Davis admitted the drugs were hers, stating, "That's mine. My brother doesn't do that." Davis also acknowledged she drove the car to the home to drop off her friend Joe Mann. See Stanley , 365 S.C. at 42-43, 615 S.E.2d at 464-65 ("In order to prove constructive possession, the State must show the defendant had dominion and control, or the right to exercise dominion and control, over either the drugs or the premises upon which the drugs are found. Such possession can be established by circumstantial or direct evidence or a combination of the two.").
At trial, a forensic chemist testified the plaid bag contained a bag holding 4.61 grams of methamphetamine and another with 2.63 grams of methamphetamine. Finally, an investigator testified the items found within the plaid bag, such as the digital scale, spoon, and baggies, indicated the methamphetamine was for distribution rather than personal use. See James , 362 S.C. at 561-62, 608 S.E.2d at 457 ("Possession of any amount of controlled substance coupled with sufficient indicia of intent to distribute will support a conviction for possession with intent to distribute."). Viewing the aforementioned evidence in the light most favorable to the State, we find a jury could reasonably deduce Davis's guilt. Accordingly, the trial court properly refused to direct a verdict in Davis's favor. See Mollison , 319 S.C. at 46, 459 S.E.2d at 91 ("If there is any direct or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find that the issues were properly submitted to the jury.").
**485 B. First-Degree Burglary
Davis argues the trial court abused its discretion in denying her motion for a directed verdict because the State failed to introduce any direct or substantial circumstantial evidence that the home was occupied, for the purposes of qualifying as a dwelling, at the time of the alleged burglary. Specifically, Davis contends the State failed to present direct or circumstantial evidence showing the homeowner left with the intention of returning. We disagree.
The pivotal question in the case at bar is whether the burglarized home was being utilized as a dwelling at the time of the alleged offense. As an initial matter, we find the trial court properly denied Davis's directed verdict motion. See Weston , 367 S.C. at 292, 625 S.E.2d at 648 ("When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight."). However, we recognize our jurisprudence does not speak directly to the facts of the case sub judice .
In South Carolina, "[a] person is guilty of burglary in the first degree if the person enters a dwelling without consent and with intent to commit a crime in the dwelling, and ... the burglary is committed by a person with a prior record of two or more convictions for burglary." S.C. Code Ann. § 16-11-311(A)(2) (2015). In the context of burglary, a "dwelling" is defined as "any house, outhouse, apartment, building, erection, shed or box in which there sleeps a proprietor, tenant, watchman, clerk, laborer or person who lodges there with a view to the protection of property." S.C. Code Ann. § 16-11-10 (2015).
*431 "[B]urglary is a crime against possession and not against property." State v. Clamp , 225 S.C. 89, 102, 80 S.E.2d 918, 924 (1954). Therefore, "the test of whether a building is a dwelling house turns on whether the occupant has left with the intention to return." State v. Glenn , 297 S.C. 29, 32, 374 S.E.2d 671, 672 (1988). "Thus, the mere fact that a building is suitable for use as a dwelling is insufficient...." State v. Ferebee , 273 S.C. 403, 405, 257 S.E.2d 154, 155 (1979). However, "the temporary absence of occupants will not prevent a residence from becoming the subject of a burglary." Id.
In considering whether an occupant had an intention to return, courts may consider circumstantial evidence depicting **486 such an intent. See State v. Evans , 376 S.C. 421, 425, 656 S.E.2d 782, 784 (Ct. App. 2008). For example, in Evans , this court found that although the occupants were unable to frequently stay at their secondary home due to health concerns, the home was still a dwelling because the occupants maintained the habitability of the structure by leaving the utilities on and checking on the home periodically. 376 S.C. at 425-26, 656 S.E.2d at 784. Additionally, in Glenn , our supreme court found sufficient evidence of an intent to return existed when the occupant left $10,000 worth of possessions in the structure. 297 S.C. at 32, 374 S.E.2d at 672.
Although our appellate courts have not yet addressed a first-degree burglary case with the factual framework of the present case, other jurisdictions with similar cases have found the structure in question to be a dwelling. For instance, in State v. Kautz , the occupants lived in the burglarized home for many years but moved out six months prior to the burglary, leaving the home vacant. 179 Or.App. 458, 39 P.3d 937, 939 (2002). The Oregon Court of Appeals found the home still constituted a dwelling, stating, "[The] defendant entered into the [occupants'] house during a short period of vacancy that followed a long period of overnight occupancy. The fortuity that [the] defendant burglarized the home during an interval when occupancy had ceased does not change the nature of his crime." Id. at 940. In Mains v. State , the occupant of the burglarized home had been living in a nursing home for two years but intended to return to the home once her health improved. 375 So.2d 1299, 1300, 1302 (Ala. Crim. App. 1979). While in the nursing home, her grandson cared for and maintained the habitability of the home. Id. at 1301. The Alabama Court of Criminal Appeals held "the jury could reasonably conclude from the testimony that, although she had been in a nursing home for some two years, the owner, ... intended to return to her house and reside therein when her condition improved." Id. at 1302. In People v. Marquez , a California appellate court stated, "It is clear the issue in the instant case turns on whether a dwelling can be considered 'inhabited' where the resident has moved to a boarding home, has had a conservatorship appointed over her, the house is being maintained, and there is a doubt she will return." 143 Cal.App.3d 797, 192 Cal.Rptr. 193, 196 (1983). Finding "[i]t is **487 the intent and not the length of absence which controls," the court held the home was a dwelling within the context of burglary. Id. at 196.
Subsection 62-8-204(5)(A) of the South Carolina Code (Supp. 2017) provides that unless otherwise stipulated, "a power of attorney granting general authority with respect to real property authorizes the agent to ... manage or conserve an interest in real property or a right incident to real property owned or claimed to be owned by the principal," including the right to "insur[e] against liability or casualty or other loss."
Here, Paul testified his mother lived in the home for thirty-seven years before moving to a nursing home for medical reasons. Paul explained as his mother's attorney in fact, he placed the home on the market because the future was uncertain; however, it was the family's hope that she would return to the home at some point. Although the record lacks direct evidence of the occupant's intent, Paul testified thirty-seven years' worth of his mother's furniture and possessions remained in the home. See Evans , 376 S.C. at 425, 656 S.E.2d at 784 (establishing when conducting an inquiry of whether an occupant had an intention to return, courts may consider circumstantial evidence depicting such an intent);
*432 Glenn , 297 S.C. at 32, 374 S.E.2d at 672 (holding sufficient circumstantial evidence of an intent to return existed when the occupant left $10,000 worth of possessions in the structure and had previously returned to gather some possessions). Further, Paul and his wife acted to protect and maintain the habitability of the home by leaving on the utilities and regularly checking on the home. Paul testified either he or his wife checked on the home every "two to three days," always leaving all the doors and windows locked.
Additionally, Paul's actions manifested an intent to return to the home. As his mother's attorney in fact, Paul was entitled to protect and enforce his mother's rights as to the home. See S.C. Code Ann. § 62-8-204(5)(A) (Supp. 2017) (providing that unless otherwise stipulated, "a power of attorney granting general authority with respect to real property authorizes the agent to ... manage or conserve an interest in real property or a right incident to real property owned or claimed to be owned by the principal," including the right to "insur[e] against liability or casualty or other loss").
**488 Viewing the foregoing in the light most favorable to the State, we find sufficient circumstantial evidence existed to create a factual dispute as to what type of structure Davis entered. See Stanley , 365 S.C. at 41, 615 S.E.2d at 464 ("On appeal from the denial of a directed verdict in a criminal case, an appellate court must view the evidence in the light most favorable to the State."); Bennett , 415 S.C. at 237, 781 S.E.2d at 354 ("[I]n ruling on a directed verdict motion where the State relies on circumstantial evidence, th[is] court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt."). Accordingly, the trial court properly refused to direct a verdict in Davis's favor. See Bennett , 415 S.C. at 236, 781 S.E.2d at 354 ("[T]he lens through which a[n appellate] court considers circumstantial evidence when ruling on a directed verdict motion is distinct from the analysis performed by the jury."); Mollison , 319 S.C. at 46, 459 S.E.2d at 91 ("If there is any direct or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find that the issues were properly submitted to the jury.").
CONCLUSION
Accordingly, the decision of the trial court is
AFFIRMED.
KONDUROS and GEATHERS, JJ., concur.

Paul testified he and his wife lived "under a quarter of a mile" from his mother's home.

Mayer testified the white substance "appeared to be methamphetamine."

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The trial court conducted a Jackson v. Denno hearing and found Davis's confession admissible. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).