572 S.E.2d 456

The STATE, Respondent,

v.

Ae KHINGRATSAIPHON, Petitioner.

No. 25554.

Supreme Court of South Carolina.

Heard Oct. 9, 2002.

Decided Nov. 12, 2002.

Chief Attorney Daniel T. Stacey, of South Carolina Office of Appellate Defense, of Columbia, for petitioner.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Tracey Colton Green, all of Columbia; and Solicitor Barbara R. Morgan, of Aiken, for respondent.

Justice BURNETT:

We granted a writ of certiorari to review the Court of Appeals' decision affirming petitioner's direct appeal.[1] *State v. Khingratsaiphon*, Op. No.2001–UP–052 (S.C. Ct.App. Filed January 29, 2001). We affirm.

## *ISSUE*

Did the Court of Appeals err by holding evidence supported the trial judge's determination the arresting officer had authority to frisk petitioner and, therefore, properly denied petitioner's motion to suppress?

## *FACTS*

Petitioner argues the Court of Appeals erred by holding there was evidence which supported the trial judge's determination the arresting officer had authority to conduct a frisk. Specifically, he contends the trial judge incorrectly premised his ruling on a finding the arresting officer heard "gun" shouted prior to the frisk and, therefore, there was no evidence supporting the trial judge's ruling. We disagree.

---

1. Petitioner was convicted of murder, possession of a firearm during the commission of a violent crime, armed robbery, and criminal conspiracy to commit armed robbery and sentenced to concurrent terms of life, five years, thirty years, and five years, respectively.

During the suppression hearing, the parties offered the following evidence. On June 23, 1997, between 9:00 a.m. and 10:30 a.m., an Aiken pawn shop was robbed and its owner was shot to death. South Carolina Law Enforcement Division (SLED) Agent Roger Sharpe testified, the morning following the crime, SLED agents conducted a roadblock next to the pawn shop. As a result of the roadblock, the agents determined a black Honda was parked in the pawn shop's lot on the morning of the crime. An Asian male was seen standing beside the vehicle.

During the roadblock, Mr. Wilson who worked across the street from the pawn shop, volunteered that his relative, Curtis Kesl from Charlotte, North Carolina, had been in Aiken on the morning of the crime. Wilson was uneasy about Kesl. He stated, in the past, Kesl had driven a Honda.

Agent Sharpe spoke with other members of Kesl's family. According to Sharpe, they were also uneasy about Kesl as Kesl had been in trouble before.

Kesl's cousin, Terry Wilson, testified, two weeks before the pawn shop crime, an Asian male accompanied Kesl to Aiken. The men stayed with Wilson over the weekend. Previously, Kesl made a collect telephone call to Wilson. Telephone records revealed Kesl had called Wilson from a Charlotte location.

Later on the morning of the roadblock, officers located an abandoned black Honda and determined it had been stolen from Charlotte on the morning of the shooting. Agent Sharpe relayed the above information to authorities in North Carolina and asked if Kesl could be located through that telephone number.

North Carolina authorities determined the Charlotte telephone number provided by Ms. Wilson was registered to Oua Vang at 305 Jones Street, Unit 3.

Charlotte–Mecklenburg Policeman G.C. Lyman testified on June 25, 1997, he was contacted by an agent with the State Bureau of Investigation in North Carolina and, among other information, was informed that an Asian had a possible connection to the shooting at the Aiken pawn shop. In addition,

he knew Curtis Kesl, a white male, was possibly connected with the case.

On the same day, Lyman and two other officers proceeded to Vang's apartment. Three Asian males were standing outside. Each were wearing warm clothing in spite of the hot, humid weather. Lyman stated they wore baggy, solid blue clothing with long sleeves and bandanas around their necks, clothing which was consistent with gang attire. Lyman observed the name of a Hmong gang scrawled on a wall facing the apartment.

Lyman stated the officers asked who lived in the apartment; all three indicated they did not live there.[2] According to Lyman, "somebody muttered something about somebody's relative, but it was not very clear and they were not very responsive." The officers then asked the three men for identification. Petitioner walked into the apartment, stating his identification was inside. Lyman testified that, had he had time to respond to petitioner, he would have requested petitioner not go inside; he was concerned both that his baggy clothing could be concealing a weapon and that there could be a weapon inside the apartment.

Lyman followed petitioner inside the apartment; he saw a white male and an Asian male in the living room/kitchen. He then followed petitioner up the stairs. Petitioner looked toward one bedroom then went into another bedroom, reached behind a curtain, and retrieved a wallet. Without opening the wallet, he stated it was not his and replaced it. At that point, petitioner started to open the closet. Because he did not want him to go into the closet for fear petitioner could obtain a weapon, Lyman testified he told petitioner he did not need identification and to return outside. Petitioner started down the stairs. At the same time, the Asian man who had been in the living room/kitchen was walking up the stairs. Lyman stated he told both men to go downstairs.

Lyman testified:

At that point, I heard a commotion, which I subsequently found out was Officer Simmons yelling "gun," but I didn't

---

**2.** Another investigator testified that the officers identified themselves as police officers to the three men outside the apartment.

hear him clearly because of the distance involved. I felt the need for a frisk at that time because my safety was in jeopardy and quickly frisked him and immediately felt in the front a large handgun. Retrieved it, it was 45 caliber Llama automatic pistol,[3] I stuck that in my back pocket.

Lyman arrested petitioner for carrying a concealed weapon and possession of a weapon by a minor.

After hearing argument, the trial judge stated as follows:
... during the totality of the circumstances here, that there was graffiti on the wall, that they did have information that it was an Asian, and this gentlemen defendant is from Thailand, he is an Asian, and because of the exigent circumstances of long-sleeved blue shirts, not normally worn during the summertime, and blue bandanas, which was indicia of some gang problems they had had up in the Charlotte–Mecklenburg area.

And I accept the testimony of the officer in this case that when he said the fellow said he had no id and then he said he was going inside to get his id that the door was open. And under those suspect circumstances, that it was proper for the officer to follow him into that house. And, in particular, even accepting the testimony of the defendant he was going in there to stash the gun, or to throw it in the closet, I believe he testified to. *In particular, when the fellow decided he better, the policeman decided he better take the fellow back outside and, of course, "gun" was hollered, he had the right to search him for his own protection, just as he had the right to search the suspect with baggy clothes on for which a gun or oozie or another dangerous type of weapon could have been underneath the clothes, that they had the right to search him....*

The pistol seized from petitioner during the frisk was admitted at trial. Petitioner's videotaped statement was also admitted.

On appeal, petitioner argued the police did not have reason to believe he was armed and dangerous and, therefore, the frisk was illegal. After reviewing the testimony from the suppression hearing, the Court of Appeals held "the

---

**3.** It was later determined the weapon belonged to the pawn shop.

record contains ample evidence supporting the trial judge's determination that the circumstances amounted to reasonable suspicion by the officer that [petitioner] was armed and dangerous." *State v. Khingratsaiphon, supra.* The Court of Appeals referred to the trial judge's language underlined above, noting the trial judge's decision was not premised on the belief Officer Lyman heard the exclamation "gun" before conducting the frisk, but rather simply that "gun" was shouted. *Id.* Ultimately, the Court of Appeals concluded the frisk was valid and the handgun and statement were properly admitted. *Id.*

## *DISCUSSION*

■■■■ The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Evidence seized in violation of the Fourth Amendment must be excluded from trial. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■■■■ The Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607, 614 (1975). A police officer may stop and briefly detain and question a person for investigative purposes, without treading upon his Fourth Amendment rights, when the officer has a reasonable suspicion supported by articulable facts, short of probable cause for arrest, that the person is involved in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion" requires a "particularized and objective basis that would lead one to suspect another of criminal activity." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981). In determining whether reasonable suspicion exists, "the totality of the circumstances—the whole picture—" must be considered. *Id.* 449 U.S. at 417, 101 S.Ct. at 695, 66 L.Ed.2d at 629.

■■■■ Subsequent to a valid *Terry* stop, a police officer may search the individual for weapons where the officer has reason to believe the person is armed and dangerous. *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

In assessing whether a suspect is armed and dangerous, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

In *State v. Brockman,* 339 S.C. 57, 66, 528 S.E.2d 661, 666 (2000), this Court considered the standard of review it would apply on appeal from a motion to suppress based on Fourth Amendment grounds. We concluded the appellate court would not review the trial judge's ultimate determination *de novo* but, rather, would apply a deferential standard of review. We stated:

> [W]e will review the trial court's ruling like any other factual finding and reverse if there is clear error. We will affirm if there is any evidence to support the ruling.

*Id.* 339 S.C. at 66, 528 S.E.2d at 666.

Contrary to petitioner's claim, *Brockman* does not hold the appellate court may not conduct its own review of the record to determine whether the trial judge's decision is supported by the evidence.

Applying *Brockman* here, we conclude the evidence from the suppression hearing supports the trial judge's decision a reasonably prudent man would have believed petitioner was armed and dangerous when Officer Lyman conducted the frisk. Officer Lyman knew an Asian male was a suspect in the pawn shop shooting. Petitioner, an Asian male, and two other Asian males were outside the apartment from which a murder suspect had placed a telephone call. Petitioner and the two other men were dressed in baggy clothing (which could easily conceal a weapon), attire which Officer Lyman associated with "gang clothing," and the name of an Asian gang appeared on a nearby wall. All three men denied living in the apartment. Nevertheless, petitioner went inside the apartment after stating his identification was inside.

Following petitioner inside the apartment, Officer Lyman observed two other men, both of whom fit the description of the murder suspect(s), inside the apartment. After following petitioner upstairs and observing petitioner search unsuccessfully for identification, Officer Lyman directed petitioner downstairs. At this moment, one of the men from the living room/kitchen was walking upstairs towards Officer Lyman and petitioner. At the same time, the officer heard a commotion outside. Because there are specific and articulable facts in evidence which support the trial judge's conclusion a reasonably prudent man would have considered petitioner armed and dangerous, the Court must affirm. *Id.*

*Assuming* the trial judge incorrectly based his ruling on the fact Officer Lyman heard "gun" before conducting the frisk, the Court must nonetheless affirm his decision because other articulable facts (baggy clothing, gang graffiti, the approach of another individual, hearing a "commotion") support the trial judge's decision upholding the frisk. *Id.* The decision of the Court of Appeals is affirmed.

**AFFIRMED.**

TOAL, C.J., MOORE and WALLER, JJ., concur.

PLEICONES, J., concurring in result only.