**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

The State, Respondent,

v.

Stepheno Jemain Alston, Appellant.

Appellate Case No. 2013-002089

———————————

Appeal From Spartanburg County
J. Derham Cole, Circuit Court Judge

———————————

Unpublished Opinion No. 2015-UP-381
Heard May 6, 2015 – Filed July 29, 2015

———————————

**AFFIRMED**

———————————

Appellate Defender Lara Mary Caudy, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Christina Catoe Bigelow, both of Columbia; and Solicitor Barry Joe Barnette, of Spartanburg, for Respondent.

———————————

**PER CURIAM:** Stepheno Jemain Alston appeals his conviction for trafficking in cocaine. He argues the trial court erred in denying his motion to suppress evidence

found in his vehicle because (1) the officer did not have reasonable suspicion or probable cause to stop Alston's car for a traffic violation, (2) the officer's continued detention of Alston exceeded the scope of the traffic stop and constituted a seizure under the Fourth Amendment, and (3) Alston's consent to search was not freely and voluntarily given and was an exploitation of an unlawful detention. We affirm.

1. Alston first contends the trial court erred when it denied his motion to suppress because Deputy Donnie Gilbert did not have reasonable suspicion or probable cause to stop Alston's car for a traffic violation. We disagree.

"Temporary detention of an individual in the course of a routine traffic stop constitutes a Fourth Amendment seizure, but where probable cause exists to believe that a traffic violation has occurred, such a seizure is reasonable per se." *State v. Tindall*, 388 S.C. 518, 521, 698 S.E.2d 203, 205 (2010). "Probable cause is defined as a good faith belief that a person is guilty of a crime when this belief rests upon such grounds as would induce an ordinarily prudent and cautious person, under the circumstances, to believe likewise." *State v. Gamble*, 405 S.C. 409, 416, 747 S.E.2d 784, 787 (2013) (internal quotation marks omitted).

"[A] policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke that suspicion." *State v. Nelson*, 336 S.C. 186, 192, 519 S.E.2d 786, 789 (1999) (internal quotation marks omitted). "Reasonable suspicion requires a particularized and objective basis that would lead one to suspect another of criminal activity." *State v. Khingratsaiphon*, 352 S.C. 62, 69, 572 S.E.2d 456, 459 (2002) (internal quotation marks omitted).

Pursuant to section 56-5-1900 of the South Carolina Code (2006), an officer may stop a driver for failing to maintain a lane. The statute states, in pertinent part:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that such movement can be made with safety.

*Id.* The South Carolina Code also defines a "highway" as "[t]he entire width *between boundary lines* of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel." S.C. Code Ann. § 56-5-430 (2006) (emphasis added). Applying this definition, we find a lane of travel constitutes the area *between* the boundary lines. *See United States v. Williams*, 945 F. Supp. 2d 665, 672 (E.D. Va. 2013) (applying a similar definition of "highway" and finding that "a driver who drives his vehicle on the boundary lines violates [Virginia's failure to maintain a lane statute], regardless of whether the driver actually crosses over the boundary lines").

We also find persuasive a line of cases that have found driving on a lane line to be a sufficient basis for a stop. *See id.* (discussing the mandate that a "vehicle shall be driven as nearly as is practicable entirely *within* a single lane" and finding "[t]he word 'within' necessarily implies boundaries, which could only refer to fog lines, and, therefore, proper driving must occur 'within' those lines—not on the lines" (internal quotation marks omitted)); *United States v. Bassols*, 775 F. Supp. 2d 1293, 1300-01 (D.N.M. 2011) (rejecting the argument that a vehicle making contact with a lane marker is "entirely within a single lane" under a statute similar to section 56-5-1900, as such an interpretation would lead to the absurd result that "two vehicles could legally occupy the same physical space at the same time despite the fact that the vehicles would collide"); *State v. McBroom*, 39 P.3d 226, 227-28 (Or. Ct. App. 2002) (applying a substantially similar statute to address a situation in which a vehicle's "tires drifted onto the closer of the double yellow dividing lines and stayed on top of that line for 300 feet or more" and finding "the phrase 'within a single lane' does not mean 'on' the lines that mark or divide the lanes").

In the instant case, Deputy Gilbert stopped Alston's vehicle after he observed the vehicle strike the dotted white lane line several times. During the suppression hearing, he provided the following testimony:

> [A]fter [Alston's vehicle] passed me[,] its left side tire struck the dotted line that divides the middle lane, which it was traveling in, and the fast lane, which would've been to its left. Then it drifted back into the middle of that middle lane. And it did that several times in the time that it took me to catch up to the vehicle.

Deputy Gilbert explained he used the word "struck" because the "tire could have covered that whole line, but it didn't go all the way across it." Because the tire of Alston's vehicle struck the lane line several times, we find Deputy Gilbert had probable cause to stop Alston's vehicle for a violation of South Carolina's failure to maintain a lane statute.

Alston argues he did not violate section 56-5-1900 because he "could have legally and safely changed lanes at the time he allegedly struck the white dotted line." This argument lacks merit, however, because Alston did not actually change lanes after passing Deputy Gilbert. In light of this fact, we find Deputy Gilbert's determination that Alston failed to maintain a lane to be reasonable.

Additionally, we find Deputy Gilbert had reasonable suspicion to support a brief investigatory detention. *See State v. Butler*, 353 S.C. 383, 389, 577 S.E.2d 498, 501 (Ct. App. 2003) (stating an officer may stop and briefly detain the occupants of a vehicle without treading on Fourth Amendment rights, even without probable cause to arrest, provided the officer has a reasonable suspicion the occupants of the vehicle are involved in criminal activity); *see also United States v. Fernandez-Castillo*, 324 F.3d 1114, 1120 (9th Cir. 2003) ("It is perfectly understandable that swerving within one's own lane of traffic . . . would support [an officer's] reasonable suspicion that [the driver] was operating a vehicle under the influence of drugs or alcohol."); *State v. Taylor*, 388 S.C. 101, 116, 694 S.E.2d 60, 68 (Ct. App. 2010) ("An additional factor to consider when determining whether reasonable suspicion exists is the officer's experience and intuition."), *rev'd on other grounds*, 401 S.C. 104, 736 S.E.2d 663 (2013).

When Deputy Gilbert approached Alston's vehicle, he asked Alston whether he was under the influence of any drugs or alcohol or was too tired to drive. He then explained it was his responsibility to ensure Alston was not under the influence of anything. Deputy Gilbert also testified Alston was "drifting" and stated that drifting could be a sign drivers are tired or "they could be having a medical condition, they could be under the influence of any alcohol or drugs, [or] they could be on the phone." We find Deputy Gilbert's statements to Alston at the scene and his testimony regarding Alston's "drifting," coupled with Deputy Gilbert's significant experience and training, support a finding that Deputy Gilbert had reasonable suspicion to warrant a traffic stop. Thus, we affirm the trial court's determination that Deputy Gilbert lawfully stopped Alston.

2. Alston next asserts the trial court erred when it denied Alston's motion to suppress because Deputy Gilbert exceeded the scope of the traffic stop without either (1) a reasonable and articulable suspicion of illegal activity to warrant detention or (2) Alston's consent.  We disagree.

"A traffic stop supported by reasonable suspicion of a traffic violation remains valid until the purpose of the traffic stop has been completed." *State v. Hewins*, 409 S.C. 93, 114, 760 S.E.2d 814, 825 (2014) (internal quotation marks omitted). "Notwithstanding that an officer may not lawfully extend the duration of a traffic stop in order to engage in off-topic questioning, this rule does not limit the scope of the officer's questions to the motorist during the traffic stop." *Id.* at 115, 760 S.E.2d at 825 (internal quotation marks omitted).  "Lengthening the detention for further questioning beyond that related to the initial stop is acceptable in two situations: (1) the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) the initial detention has become a consensual encounter." *State v. Provet*, 391 S.C. 494, 500, 706 S.E.2d 513, 516 (Ct. App. 2011), *aff'd*, 405 S.C. 101, 747 S.E.2d 453 (2013).

"Reasonable suspicion requires a particularized and objective basis that would lead one to suspect another of criminal activity." *Khingratsaiphon*, 352 S.C. at 69, 572 S.E.2d at 459 (internal quotation marks omitted).  "Reasonable suspicion is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act." *Provet*, 391 S.C. at 500, 706 S.E.2d at 516 (internal quotation marks omitted).

When determining whether the officer had an objectively reasonable and articulable suspicion of illegal activity, courts must consider the totality of the circumstances. *Id.* at 500-01, 706 S.E.2d at 516.  When applying a totality of the circumstances analysis, "[c]ourts may not find a stop unjustified based merely on a piecemeal refutation of each individual fact and inference." *State v. Taylor*, 401 S.C. 104, 112, 736 S.E.2d 663, 667 (2013).  Furthermore, it is a "well-settled principle that courts must give due weight to common sense judgments reached by officers in light of their experience and training." *Id.* at 113, 736 S.E.2d at 667.

In the present case, Deputy Gilbert completed the warning ticket once he received notification from dispatch that there were no problems with either Alston's license or the vehicle's registration.  However, Deputy Gilbert testified he never gave the

warning ticket to Alston and did not return Alston's license or the rental contract. At this point, the purpose of the traffic stop was fulfilled; nonetheless, Deputy Gilbert continued to question Alston for approximately a minute and a half before asking Alston if he could search the vehicle. We find this continued questioning exceeded the scope of the initial traffic stop.

However, the extended detention was permissible because Deputy Gilbert had an objectively reasonable and articulable suspicion that illegal activity was occurring. *See Provet*, 391 S.C. at 500, 706 S.E.2d at 516 ("Lengthening the detention for further questioning beyond that related to the initial stop is acceptable [when] the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring . . . ."). Deputy Gilbert testified during the suppression hearing regarding what transpired during the traffic stop. He described various things that occurred or that he observed that raised a suspicion, including (1) Alston's luggage was covered by a blanket, which Deputy Gilbert testified was not typical with the motoring public; (2) Alston asked why he was being stopped as soon as Deputy Gilbert approached the vehicle, which Deputy Gilbert testified was "not consistent with the innocent motoring public"; (3) Alston was from Rome, Georgia, near Atlanta, which Deputy Gilbert referred to as "a major hub for criminal activity in the southeast"; (4) Alston was driving on Interstate 85, which Deputy Gilbert referred to as "a major criminal activity corridor"; (5) the vehicle was rented in the name of a third party who was not present, which Deputy Gilbert testified "is very common when it comes to criminal activity"; (6) the vehicle was rented in a woman's name, which Deputy Gilbert explained occurs because criminal organizations think police do not associate criminal activity with women; (7) the vehicle was being driven in South Carolina, a state not permitted under the rental agreement; (8) Alston put an air freshener in the car, which Deputy Gilbert testified could be used to mask the odor of drugs and is odd "because in a rental vehicle you just don't see people go straight to a store and buy an air freshener"; (9) Alston placed his house keys on the key ring for the rental car, which Deputy Gilbert believed was odd because it seemed like Alston was "trying to personalize the vehicle"; (10) Alston's travel plans did not comply with the rental agreement because he was not permitted to drive in New Jersey and would not be able to return the vehicle on time; (11) Alston said he was going to pick up his mother for Mother's Day, which was a month and a half away; and (12) Alston said he had six children but listed the ages of seven children, which, according to Deputy Gilbert, meant Alston was unable to handle the stress of the situation.

Additionally, Deputy Gilbert had over eleven years of experience at the time of Alston's arrest and had completed "somewhere between five hundred and six hundred hours of interdiction training." When considering all of the factors Deputy Gilbert enumerated, as well as his training and experience, we believe he had a reasonable suspicion that a crime was being committed.[1]

3. Alston also contends his consent to search was not freely and voluntarily given. We disagree.

"Warrantless searches and seizures are reasonable within the meaning of the Fourth Amendment when conducted under the authority of voluntary consent." *Palacio v. State*, 333 S.C. 506, 514, 511 S.E.2d 62, 66 (1999). When determining whether the consent to search was voluntary or the product of coercion or duress, this court considers the totality of the circumstances. *State v. Wallace*, 269 S.C. 547, 550, 238 S.E.2d 675, 676 (1977). The trial court's determination regarding voluntariness will not be disturbed on appeal unless it amounts to an abuse of discretion. *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 247 (1990). Further, "[c]onduct falling short of an unequivocal act or statement of withdrawal is not sufficiently indicative of an intent to withdraw consent." *State v. Mattison*, 352 S.C. 577, 587, 575 S.E.2d 852, 857 (Ct. App. 2003) (internal quotation marks omitted).

Deputy Gilbert testified he did not take out his weapon while asking for consent to search and he did not believe he coerced Alston to obtain his consent. We note Deputy Gilbert did not issue the warning ticket or tell Alston he was free to leave before asking to search the vehicle. However, the Constitution does not require an officer to inform a motorist he is free to leave before obtaining consent. *See Ohio v. Robinette*, 519 U.S. 33, 35, 39-40 (1996) (rejecting a per se rule that would render consent involuntary if an officer failed to advise a motorist he was free to go before requesting consent and finding the failure to give such advice to be only one factor to consider in the overall analysis).

---

[1] Because we determined the continued detention of Alston was permissible based on Deputy Gilbert's objectively reasonable and articulable suspicion of illegal activity, we need not address whether the traffic stop evolved into a consensual encounter. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding appellate courts need not address remaining issues when the resolution of a prior issue is dispositive).

Although Alston was never told he was free to leave, we believe his consent was voluntarily given. Even though Deputy Gilbert had already obtained Alston's consent, Deputy Gilbert confirmed Alston understood what was transpiring and knew he had the right to refuse Deputy Gilbert's request to search. Although after initially consenting Alston stated, "I'm not giving you consent, you the one giving consent," Alston never explicitly stated he was withdrawing consent and subsequently stated Deputy Gilbert could search the vehicle. *Mattison*, 352 S.C. at 587, 575 S.E.2d at 857 ("Effective withdrawal of a consent to search requires unequivocal conduct . . . that is inconsistent with consent previously given."). Therefore, the trial court did not err in determining Alston freely and voluntarily consented to the search.[2]

**AFFIRMED.**

**THOMAS, KONDUROS, and GEATHERS, JJ., concur.**

---

[2] Alston also asserts his consent was invalid as an exploitation of an unlawful detention. Because we determined Deputy Gilbert had a reasonable suspicion that a crime was being committed, his continued detention of Alston was lawful. Accordingly, Alston's consent was not invalid.