# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Justin Tyler Ellaree Hopkins, Appellant.

Appellate Case No. 2022-001567

―――――――――

Appeal From Lexington County
Debra R. McCaslin, Circuit Court Judge

―――――――――

Opinion No. 6126
Heard May 6, 2025 – Filed December 3, 2025

―――――――――

**AFFIRMED**

―――――――――

Appellate Defender Gary Howard Johnson, II, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Assistant Attorney General Tommy Evans, Jr., all of
Columbia, and Solicitor Samuel R. Hubbard, III, of
Lexington, all for Respondent.

―――――――――

**MCDONALD, J.:** Justin T. Hopkins appeals his convictions for murder and
burglary, arguing the circuit court erred in denying his motions to suppress: (1)
evidence obtained from the traffic stop of a vehicle seen leaving the parking area
of his apartment; (2) DNA evidence connected to his DNA profile; and (3)
evidence obtained during the search of his apartment. We affirm.

**Facts and Procedural History**

In December 2019, Donnovin Haynes and Sheldon Livingston lived together at Woodland Village Apartments in Lexington County. Haynes's friends, Duwan Williams and Branton Booker, slept on the apartment couches when they needed a place to stay. Haynes eventually admitted to law enforcement that Booker sold drugs from the apartment.

On the morning of December 17, 2019, Haynes awoke to the sounds of gunfire coming from inside the apartment. He ran to his bathroom, secured the door, and locked himself in the bathroom closet. While hiding, Haynes heard the breaching of doors and an unfamiliar voice say, "Where's it at?" When an intruder attempted to kick in the closet door, Haynes used his weight to keep the door closed. The assailant abandoned his effort to breach the closet door after another intruder said, "Here it is. I found it." Once the intruders were gone and Haynes was able to exit the bathroom, he saw a body beneath a pile of clothes in the hallway. He grabbed his pants, jumped from a window, and fled to a neighbor's apartment to call 911.

Officer Scott Purdy of the Lexington County Sheriff's Department (LCSD) responded to Haynes's 10:59 a.m. 911 call and arrived on scene to find Haynes standing in the parking lot wearing only a pair of pants. Officer Purdy observed Haynes was "super upset, kind of flailing all about and in a panic." When Haynes reported that his friends had been shot, the responding officers kicked in the locked front door to access the apartment.

Inside the apartment, Officer Purdy observed blood, and the officers could hear someone—later identified as Williams—struggling to breathe. Officer Purdy found Williams bleeding heavily, wrapped in a blanket on a couch. As law enforcement cleared the scene, officers found open cabinets and noted everything from the hallway closet had been dumped onto the floor. They also found Livingston's body—he had been shot and left on the floor in his bedroom. Officers then discovered a second decedent, Booker, beneath the pile of items pulled from the hallway closet.

After calling for EMS, Officer Purdy worked to secure the crime scene while Detective John Donnelly rendered aid to Williams, who was still alive at that point. When asked if he knew who shot him, Williams replied, "No, not at all. I was asleep." Williams subsequently succumbed to his injuries.

Detective Donnelly later observed blood on a door jamb, suggesting an incident had occurred near the front door. In this same area, Crime Scene Investigator Patrick Ward found a small blood trail from the laminate floor by the front door heading toward the hallway where Booker's body was found.

The LCSD recovered multiple 9mm casings as well as projectiles consistent with a .38mm revolver from the apartment. Investigator Ward photographed foot impressions near the interior doors and processed the scene for fingerprints, touch DNA, and blood. As part of the evidence collection process, Investigator Ward swabbed the dead bolt latch on the inside of the apartment door for touch DNA. Officers also recovered a digital scale and two bags of green plant material. No cash was found in the apartment, and Haynes's rent money was missing from the counter in his bathroom.

Law enforcement received several tips in the days following the home invasion. Christy Meneses reported that around 11:00 a.m. on the day of the murders, she saw a heavyset black male with a Band-Aid on his face pass her on a bicycle and get into a white truck with dual rear wheels. The truck was hauling equipment in the rear of the Woodland Village parking lot and was driving very fast. This seemed strange to her due to the speed bumps in the area. Meneses saw the heavyset male throw the bike down and get into the truck; he then exited the vehicle and propped the bike up against a pole before re-entering the truck. Officers drove around for several hours that day searching for a white dual-wheel truck but did not locate the suspect vehicle.

Additional tips to the LCSD resulted in the development of Hopkins as a potential suspect. In his affidavit supporting the search warrant application for Hopkins's apartment, LCSD Detective Jacob Hendrix explained:

> A confidential informant ("CI") provided information that he was made aware by an acquaintance that a 9mm Glock 26 handgun was for sale at a discounted price because it was "hot". The gun was described to the "CI" to have "3 bodies" on it, and the shooter was described as [a] heavy set light skinned black male with a beard named Justin or "Justo," who lived in Landmark Apartments. It was reported by the "CI" that the shooting was a relation [sic] for a physical fight that recently took place with some of the victim's [sic] at the incident location, and following the shooting, the "CI" reported

that a firearm and several miscellaneous items were taken. The details provided by the "CI" were verifiable non-public details of the crime and surrounding circumstances, to include a firearm having been taken from the residence, the recent fight at the incident location, and the suspected make and caliber of the murder weapon. Through information gathered through social media, Landmark Apartment records, and the SC DMV this new person of interest was identified as Justin Hopkins.

Officers confirmed that the phone number connected to the sale of the firearm was the same number Hopkins listed on his paperwork with Landmark Apartments. The LCSD then monitored a phone call between the informant and Hopkins during which Hopkins confirmed he had a Glock for sale for $380. Another individual who lived near the incident scene reported looking out his back door and seeing a person matching Hopkins's description fleeing the scene; this witness later identified Hopkins from a lineup. The LCSD also received a report that Hopkins matched the description of an individual who had been involved in a prior physical altercation at Woodland Village. In addition to all of this, investigators received a tip that Hopkins committed the offense with someone referred to as his "uncle" and learned "another mutual acquaintance heard information directly from Hopkins that he (Hopkins) committed the triple homicide."

On December 21, 2019, the LCSD confirmed that Hopkins lived in the Landmark Apartments. Property manager Kim Herlong testified Hopkins lived in the Landmark unit 27A, the apartment leased to his half-brother, Maxi Jacobs. Jacobs lived elsewhere with his girlfriend, and he told Hopkins in November 2019 that he would need to take over the lease when it expired in January. Herlong provided Hopkins with the leasing application, and in December 2019, Hopkins completed the application and noted his contact information—including his phone number.

The LCSD then sought a search warrant for Landmark Apartment 27A. In the meantime, Detective James Pratt was assigned to conduct surveillance of the apartment. On the evening of December 21, Detective Pratt saw a white dual rear-wheel truck pull up to the apartment; a male matching Hopkins's description exited the truck and entered apartment 27A. Detective Pratt notified Sergeant Nick Burt of the truck's arrival, and Burt instructed him to try to get a tag number and find a reason to stop the truck. Once he was about a mile away from the apartments, Detective Pratt initiated a traffic stop due to the truck's defective tag

light.  Pratt testified that he waited to initiate the stop to avoid alerting Hopkins, who was still inside the apartment.  Pratt observed construction equipment in the bed of the truck and vehicle wear and tear consistent with construction work.  He further noted the truck matched the description of the vehicle Meneses saw leaving Woodland Village around the time of the murders.

During this traffic stop, Detective Pratt spoke with the driver—Jeremy Cornish—and Cornish's girlfriend.  Cornish gave Detective Pratt his license and some December 17 paperwork from the South Carolina Department of Motor Vehicles (DMV) bearing Justin Hopkins's name.  Although Cornish confirmed he had just dropped off Hopkins and admitted he had known Hopkins for several years, he claimed their relationship was "fairly sterile."  When questioned about his whereabouts on December 17, Cornish claimed he picked Hopkins up from Food Lion that morning but later dropped him back off because rain prevented the completion of their scheduled work at McEntire Air Force Base.  Cornish did not admit to being with Hopkins at any other point on December 17; he reported that he went to the DMV and the bank and then remained at home with his girlfriend.  He denied having any knowledge of the December 17 murders or the subsequent news coverage.  Cornish consented to a search of the truck and allowed law enforcement to photograph messages from his phone.  Other than Cornish's connection to Hopkins, officers found no incriminating evidence during their search of the truck.  Thus, Cornish was allowed to leave following the traffic stop.  At this time, law enforcement was unaware of the extent of Cornish's involvement in the murders—they were instead focused on the white truck and the heavyset man (Hopkins) identified by a witness.

When Detective Pratt left Woodland Village to follow the white truck, LCSD Lieutenant Jonathan Brock assumed surveillance at the Hopkins apartment.  Brock, who drove an unmarked red pickup truck assigned to narcotics, estimated it took him fifteen or twenty minutes to get to the Landmark Apartments that night.

Around 8:30 p.m. on December 21, a magistrate signed the search warrant for apartment 27A, and Detective Hendrix radioed that the warrant had been obtained.  As Lieutenant Brock continued to watch the apartment, he saw a car pull into a parking spot; an individual then exited the car and entered the apartment.  At the time, Brock was unable to identify this individual because the car's lights were shining in his eyes.  However, a little while later, someone carrying bags exited apartment 27A and crossed in front of the headlights before entering the backseat of the car.  Lieutenant Brock identified this person as Hopkins and requested that a

marked vehicle respond to stop the car as it left the parking lot. Lieutenant Brock explained:

> So I called for a marked vehicle and the reason behind that is that I want a vehicle that is clearly identifiable as law enforcement with a light bar on top, the 360 lights, clearly has sheriff's department written on the side because when Mr. Hopkins got into the backseat of that vehicle and the vehicle's leaving, then I know that that vehicle is occupied by at least one other person who had to be driving that vehicle. Now I was accompanied in my truck by another officer, but it was two of us and I had no idea really who that other person in that vehicle was. Also, you know, it was a safety concern for us because I don't know who I'm about to deal with and the more law enforcement that is on the traffic stop I feel like that would be safer and would cause somebody to pause before trying to do anything that would harm me or the person that I'm with.

Lieutenant Brock followed this car as it left the Landmark Apartments.[1]

LCSD Sergeant Aaron Poole arrived at Lieutenant Brock's location about a mile from the Landmark Apartments and initiated the traffic stop at 8:59 p.m. When Lieutenant Brock approached the car and shined his flashlight into the backseat, he observed Hopkins reaching toward the bags at his feet. Brock instructed Hopkins to put his hands up, and Hopkins complied. Hopkins was arrested during this traffic stop.

Sergeant Burt seized the bags and obtained a search warrant for them. Inside the bags, Sergeant Burt found Hopkins's wallet, his identification card, a cell phone, a charger, a digital scale, white t-shirts, two .38 casings, three .38 rounds, and a 9mm round. He also recovered a long-sleeved, "yellowish color" sweatshirt.

Meanwhile, law enforcement executed the search warrant at Hopkins's apartment. Investigators photographed a trash can containing several Band-Aids and noted a certificate with Hopkins's name displayed in the apartment. No firearms or

---

[1] During his testimony, Sergeant Burt also referenced the safety concerns involved with conducting a nighttime traffic stop in an unmarked car.

ammunition were recovered from the apartment, but officers seized a pair of work boots[2] and a red and white shirt with a reddish-brown stain.

The investigation continued after Hopkins's arrest, as officers gathered pictures and videos of Cornish and Hopkins's activities on the day of the murders. Surveillance footage from KJ's Market, a grocery store near the Landmark Apartments, showed a white dually truck approaching the parking lot from the direction of Woodland Village. Captain Jesse Laintz testified that a KJ's video also showed an individual with a distinguishing mark on his face exit the truck, and he identified this person as Hopkins. The video time stamp showed Hopkins was at KJ's at 11:10 a.m., and his shirt appeared discolored near the back of his right hip. Captain Laintz further observed Hopkins's vigilance and described him as having his "head on a swivel," constantly checking his surroundings while at KJ's. Hopkins is wearing brown or tan work boots in the KJ's video.

Investigators used the information from Hopkins's DMV paperwork to obtain DMV video footage and information about the transactions the two men conducted on the day of the murders. DMV records indicated Hopkins and Cornish were at the DMV together at 9:44 a.m. on December 17. The DMV video shows a heavyset black male wearing a yellowish or orangish shirt entering the DMV with someone matching Cornish's description. Captain Laintz further observed Hopkins appeared to have a Band-Aid on his face. DMV customer service receipts reflect additional transactions by Cornish later that afternoon.

In August 2022, a Lexington County grand jury indicted Hopkins and Cornish for three counts of murder and one count of first-degree burglary; the two men were later tried separately. Pretrial, Hopkins moved to suppress any evidence obtained during the search of the car in which he was a passenger on the night of his arrest. He also sought to suppress DNA evidence connected to his own DNA profile and to Cornish.

At trial, South Carolina Law Enforcement Division (SLED) firearms expert Agent James Green testified that two different handguns were used in the murders and noted rounds consistent with each were found in the bags seized from Hopkins during the traffic stop. SLED Agent Melinda Worley, an expert in footwear impression examination and identification, testified that the work boots seized

---

[2] The LCSD also seized work boots found in a search of Cornish's apartment.

from Hopkins's apartment were consistent with the footwear impression found at the crime scene.

SLED Agent Samuel Stewart testified as an expert in DNA analysis. Agent Stewart explained the analysis for touch DNA from the Woodland Village apartment's deadbolt revealed a mix of contributors, one of whom was Cornish. Agent Stewart also analyzed the DNA found on the stained white T-shirt seized from one of Hopkins's bags and testified that decedent Williams was a match for the blood stain. Testing of swabs from the collar and underarms of the shirt indicated Hopkins was the number one DNA contributor for these areas.

Ultimately, the jury found Hopkins guilty of three counts of murder and one count of first-degree burglary. The circuit court imposed concurrent life sentences for the murders and eighteen years' imprisonment for first-degree burglary. Hopkins timely appealed.

**Standard of Review**

"In criminal cases, appellate courts sit to review errors of law only." *State v. English*, 443 S.C. 49, 55, 902 S.E.2d 385, 388 (2024).

> [A]ppellate review of a motion to suppress based on the Fourth Amendment involves a two-step analysis. This dual inquiry means we review the trial court's factual findings for any evidentiary support, but the ultimate legal conclusion . . . is a question of law subject to de novo review.

*State v. Frasier*, 437 S.C. 625, 633-34, 879 S.E.2d 762, 766 (2022).

**Law and Analysis**

**I. The Traffic Stop and Search of Hopkins's Bags**

Hopkins argues the circuit court erred in finding the search warrant for his apartment allowed law enforcement to stop the vehicle seen leaving the Landmark Apartments parking lot. But this argument ignores the other grounds supporting the traffic stop and does not fully address the circuit court's findings. In this case, the search warrant was not the sole justification for the stop; indeed, abundant

reasonable suspicion existed for law enforcement to stop the car in which Hopkins was a passenger.

"The stopping of a vehicle and the detention of its occupants constitute a seizure and implicate the Fourth Amendment's prohibition against unreasonable searches and seizures." *State v. Rowland*, 444 S.C. 84, 95, 905 S.E.2d 825, 831 (Ct. App. 2024), *cert. denied* (Mar. 12, 2025). "Our courts have held that in South Carolina, an officer may stop and briefly detain the occupants of a car without treading on Fourth Amendment rights, even without probable cause to arrest, if he has a reasonable suspicion that the occupants are involved in criminal activity." *Id.* at 96, 905 S.E.2d at 831; *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968) (holding a police officer may briefly stop and detain a person to make "reasonable inquiries" when the officer sees "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"). "The term 'reasonable suspicion' requires a particularized and objective basis that would lead one to suspect another of criminal activity." *Rowland*, 444 S.C. at 96, 905 S.E.2d at 831 (quoting *State v. Woodruff*, 344 S.C. 537, 546, 544 S.E.2d 290, 295 (Ct. App. 2001) (citations omitted)). "Although reasonable suspicion is not susceptible to a rigid, formulaic approach, it requires more than a mere hunch or unparticularized suspicion." *Frasier*, 437 S.C. at 635, 879 S.E.2d at 767. "While reasonable suspicion is not a high bar and 'is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "This inquiry involves the totality of the circumstances, and '[c]ourts must give due weight to common sense judgments reached by officers in light of their experience and training.'" *Id.* (alteration by court) (quoting *State v. Moore*, 415 S.C. 245, 252-53, 781 S.E.2d 897, 901 (2016)). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990).

In *Michigan v. Summers*, the United States Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. 692, 705 (1981) (footnote omitted). The Court explained, "If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." *Id.* at 704-05.

The Supreme Court later clarified *Summers* in *Bailey v. United States*:

> *Summers* recognized that a rule permitting the detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion, was reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search. Because this exception grants substantial authority to police officers to detain outside of the traditional rules of the Fourth Amendment, it must be circumscribed.
>
> A spatial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a search warrant. The police action permitted here—the search of a residence—has a spatial dimension, and so a spatial or geographical boundary can be used to determine the area within which both the search and detention incident to that search may occur. Limiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe.

568 U.S. 186, 200-01 (2013).

> Because detention is justified by the interests in executing a safe and efficient search, the decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place. If officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity, the lawfulness of detention is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under *Terry* or an arrest based on probable cause. A suspect's particular actions in leaving the scene,

including whether he appears to be armed or fleeing with the evidence sought, and any information the officers acquire from those who are conducting the search, including information that incriminating evidence has been discovered, will bear, of course, on the lawfulness of a later stop or detention.

*Id.* at 201-02.

During pretrial motions, the State proffered testimony addressing the search warrants and the Hopkins traffic stop. Lieutenant Brock explained he was surveilling Hopkins's apartment in an unmarked truck when he observed a car pull up; an unidentified individual then exited this car and entered Apartment 27A. Detective Hendrix later radioed that the search warrant for Hopkins's apartment had been signed, and shortly thereafter, Lieutenant Brock saw someone exit the apartment and enter this car. Lieutenant Brock identified this individual based upon Hopkins's description and photographs obtained in the investigation. He further noted Hopkins's "height and weight were pretty discernable," with Hopkins being five feet, nine inches tall and weighing three hundred pounds.

Lieutenant Brock explained he would have stopped the vehicle before it left the parking lot, but the unmarked narcotics truck in which he was conducting surveillance presented safety concerns. According to Lieutenant Brock, the better practice is to conduct nighttime traffic stops with a marked police vehicle outfitted with visible lights so that people are aware it is indeed law enforcement attempting a stop. He further noted no weapons had been recovered in connection with the three murders; thus, it was his belief that Hopkins, already identified as a suspect, was likely armed. A white dual rear-wheel truck seen leaving the apartments earlier in the evening had already been stopped, and officers were justifiably concerned that someone might have tipped off Hopkins that law enforcement was preparing to search his apartment.

The circuit court found the traffic stop was properly supported by reasonable suspicion and further recognized that the search warrant was signed before law enforcement observed Hopkins leaving his apartment with the two bags. The circuit court acknowledged the safety concerns associated with having an unmarked vehicle initiate the traffic stop because this was a triple homicide investigation and law enforcement did not know whether Hopkins was armed when he entered the vehicle with his bags. Due to these safety concerns and the

nighttime hour, the circuit court properly recognized that it was reasonable for law enforcement to wait for a marked car to arrive before executing the stop.

Although Hopkins correctly argues that the authority of a search warrant may not necessarily extend to the search of a vehicle a mile away from the subject premises, in this case the search warrant merely provides further support for the circuit court's reasonable suspicion analysis. *See White*, 496 U.S. at 330 ("Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability."). Here, a magistrate found probable cause existed for the apartment search upon signing the search warrant identifying Hopkins as the suspect in the investigation of a home invasion and three murders. These facts would have been known throughout the LCSD due to the regular briefings held in the days following the murders to share information, intelligence, and "what need[ed] to be done moving forward" in the case. In addition to the prior excerpt, the detailed warrant affidavit states:

> The "CI" spoke to Justin [Hopkins] by phone while law enforcement listened which we were able to confirm was the same Verizon Wireless number listed for him with Landmark Apartments as accurate, and during the call Justin confirmed that he had a Glock handgun for sale for $380.00. Justin, who lives within approximately a mile of the incident location, at 5 feet 9 inches tall and 300 lbs, also matches the distinct physical description of a short, heavy set light skinned black male with a beard seen fleeing the area by multiple witnesses. One witness reported that he heard loud noise coming from the incident location, similar to a hammer hitting wood and after looking out his back door saw an individual matching this description running from the scene. The same witness was presented with a photo lineup and positively identified the same Justin Tyler Ellaree Hopkins as the individual seen running from the scene the day and time of the incident. He also described seeing Justin near the incident location on previous occasions, and Justin's description is consistent with individuals described by another witness as having been in a fight at this location recently.

In addition to all of this, law enforcement was concerned about the potential destruction of evidence—Hopkins exited his apartment that night with two bags, and a confidential informant had previously reported Hopkins's efforts to sell a "hot" gun with "3 bodies on it." *See Rowland*, 444 S.C. at 96, 905 S.E.2d at 831 ("Our courts have held that in South Carolina, an officer may stop and briefly detain the occupants of a car without treading on Fourth Amendment rights, even without probable cause to arrest, if he has a reasonable suspicion that the occupants are involved in criminal activity."). Lieutenant Brock further noted law enforcement had not yet recovered the weapons connected with the murders. He identified Hopkins based upon the descriptions given, photos and videos obtained early in the investigation, and Hopkins's "pretty discernable" height and weight. Lieutenant Brock did not call for the traffic stop merely because Hopkins was seen leaving the apartment to be searched. Rather, law enforcement had independent, reasonable suspicion to call for a uniformed officer to execute the traffic stop, and the fact that a magistrate found probable cause to believe the suspect's apartment contained evidence of these crimes was an additional factor appropriate to the analysis. *See Fraser*, 437 S.C. at 635, 879 S.E.2d at 767 ("This inquiry involves the totality of the circumstances, and '[c]ourts must give due weight to common sense judgments reached by officers in light of their experience and training.'" (alteration by court) (quoting *Moore*, 415 S.C. at 252-53, 781 S.E.2d at 901)). Accordingly, we affirm the circuit court as to this issue.

## II. DNA

Hopkins next argues the circuit court erred in refusing to suppress DNA evidence connected to both his DNA profile and Cornish's DNA profile. Hopkins contends the State improperly collected both samples based upon an assumption that the two men's DNA would be useful, rather than the existence of actual evidence. He further asserts the warrant affidavits lacked the required assertion that the identified suspects' DNA was found at the crime scene. We disagree, and we emphasize that there is no requirement that law enforcement develop a full or partial DNA profile before seeking a properly supported warrant for the collection of a suspect's DNA.

"[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search." *Maryland v. King*, 569 U.S. 435, 446 (2013).

> Considerations for determining whether or not there exists probable cause to permit the acquisition of such nontestimonial identification evidence include the

following elements: (1) probable cause to believe the suspect has committed the crime; (2) a clear indication that relevant material evidence will be found; and (3) the method used to secure it is safe and reliable.

*State v. Chisholm*, 395 S.C. 259, 267, 717 S.E.2d 614, 618 (Ct. App. 2011). "Additional factors to be weighed are the seriousness of the crime and the importance of the evidence to the investigation.  The judge is required to balance the necessity for acquiring involuntary nontestimonial identification evidence against constitutional safeguards prohibiting unreasonable bodily intrusions, searches, and seizures." *State v. Baccus*, 367 S.C. 41, 54, 625 S.E.2d 216, 223 (2006).

During pretrial motions, the State argued Hopkins's DNA obtained pursuant to a September 23, 2022 search warrant was admissible.  The State noted Hopkins's buccal swabs were obtained when he was arrested in 2019, and his DNA was entered into the Combined DNA Index System (CODIS) at that time.  SLED identified Hopkins's DNA on a shirt (found in one of his bags during the traffic stop) that also contained blood matching decedent Williams's DNA exemplar. Law enforcement would have requested that SLED enter the DNA into CODIS had there been no such sample for comparison.  Thus, even in the absence of a proper warrant, the State would have inevitably discovered the DNA match through a CODIS comparison.

The State explained that it sought to obtain a new set of buccal swabs from Hopkins once SLED identified the blood on the T-shirt as belonging to Williams. Detectives appropriately believed Hopkins's DNA was needed to compare to the reference samples collected from the crime scene and Hopkins's bags, and the State sought the buccal swab warrants for such comparisons.

Hopkins argues the affidavit supporting the buccal swab request did not appropriately identify the evidence to which his DNA would be compared.  He reasons that the mere fact that law enforcement seeks to obtain buccal swabs does not indicate material evidence of a suspect's guilt exists and emphasizes there is no mention in the warrant affidavit that a DNA profile had been developed.  Such an argument puts the cart before the horse.

Like the circuit court, we are unaware of any authority requiring that either a full or partial DNA profile be developed before law enforcement may properly seek a warrant for buccal swabs (or obtain them for processing upon an individual's

arrest). As the circuit court stated, "I think the bottom line is, is that you've got to have something that's relevant evidence to compare it too. I don't think that you can think that DNA's gonna be developed overnight and you have your result." The circuit court further explained,

> I read the Maryland case [today and] the moment that you're arrested they do a DNA swab on you, just the moment you're arrested, and then they run it through the whole database and compare it to whatever they want to. So, I mean, I'm not real sure that I'm sold on the idea I need some partial or a full profile before we do that. I think they did have items to compare. I think it was relevant evidence. All of it came from the murder scene, the T-shirt with the blood on it, I think that is sufficient, so I'm going to allow that search warrant.

A December 22, 2019 warrant sought buccal swabs from Hopkins, and the LCSD collected these swabs later that day. On September 23, 2022, additional warrants were issued for Hopkins's DNA and Cornish's DNA. The Hopkins warrant affidavit noted, "The requested property is sought as [a] known standard to compare against DNA swabs for touch DNA and swabs of blood taken from the crime scene, which it is reasonably believed will further tie Justin [Hopkins] to this incident." As discussed in Section I, the December 21, 2019 search warrant affidavit contains detailed information addressing how law enforcement came to develop Hopkins as a suspect in the murders. This alone sufficiently established the need (and the requisite probable cause) to collect Hopkins's DNA. The equally detailed September 2022 warrant affidavit contains additional information gathered after Hopkins's arrest related to the items found in the search of Hopkins's apartment and the bags seized during his traffic stop. We agree with the circuit court that there is no requirement that law enforcement develop a DNA profile from crime scene evidence *prior* to seeking a warrant for comparison buccal swabs, so long as the requisite probable cause exists to seek the samples, and the *Chisolm* factors are satisfied. *See, e.g.*, *United States v. Grubbs*, 547 U.S. 90, 95 (2006) ("Because the probable-cause requirement looks to whether evidence will be found when the search is conducted, all warrants are, in a sense, 'anticipatory.' In the typical case where the police seek permission to search a house for an item they believe is already located there, the magistrate's determination that there is probable cause for the search amounts to a prediction that the item will still be there when the warrant is executed."). The circuit court properly denied Hopkins's motion to suppress the DNA evidence.

## III.  Search of the Landmark Apartment

Hopkins next argues the circuit court erred in refusing to suppress evidence obtained during the search of his apartment.  He contends the supporting warrant affidavit was defective because it lacked information to support a probable cause finding that Hopkins actually lived in the apartment to be searched.  We disagree.

"Evidence seized in violation of the Fourth Amendment must be excluded from trial."  *State v. Dill*, 423 S.C. 534, 542, 816 S.E.2d 557, 562 (2018) (quoting *State v. Khingratsaiphon*, 352 S.C. 62, 69, 572 S.E.2d 456, 459 (2002)).  "A search or seizure is reasonable under the Fourth Amendment when it is authorized by a warrant that is supported by probable cause."  *Id.*  "A warrant is supported by probable cause if, given the totality of the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *State v. Kinloch*, 410 S.C. 612, 617, 767 S.E.2d 153, 155 (2014).  "Our task is to decide whether the magistrate had a substantial basis for concluding probable cause existed.  The term 'probable cause' does not import absolute certainty.  Rather, in determining whether a search warrant should be issued, magistrates are concerned with probabilities and not certainties."  *State v. Crummey*, 443 S.C. 94, 107, 902 S.E.2d 391, 398 (Ct. App. 2024) (quoting *State v. Dupree*, 354 S.C. 676, 683, 583 S.E.2d 437, 441 (Ct. App. 2003)).

> In South Carolina, search warrants may be issued "only upon affidavit sworn to before the magistrate . . . establishing the grounds for the warrant."  The affidavit must set forth particular facts and circumstances underlying the existence of probable cause to allow the magistrate to make an independent evaluation of the matter.

*Baccus*, 367 S.C. at 50-51, 625 S.E.2d at 221 (citations omitted) (quoting S.C. Code Ann. § 17-13-140 (2003)).

During pretrial motions, Sergeant Burt explained that Hopkins had been positively identified as the individual getting into the white dually truck on the day of the murders and that an LCSD officer who lived at the Landmark Apartments as a courtesy officer was able to confirm Hopkins lived in apartment 27A.

Considering the parties' arguments, the circuit court noted, "I was looking at the affidavit. I must be missing something because I can't find anything wrong with it. It says Landmark Apartments. The room to be searched is 27A." When Hopkins argued the description of the place to be searched in the warrant affidavit did not specifically identify the apartment as apartment 27A, the circuit court responded, "I think it says pretty clear where they're wanting to go." Hopkins then claimed that although the description of the property to be searched indicated the apartment number, it was necessary that this information be repeated in the affidavit. He further asserted a proper affidavit must contain the reason for the affiant's belief that the property sought was on the subject premises and state that Hopkins resided in 27A. The State noted the affidavit indicated law enforcement obtained records from an employee at Landmark Apartments indicating Hopkins lived there, Hopkins's phone number was associated with Landmark Apartments, and information obtained from social media indicated Hopkins lived at Landmark.

The circuit court found the search warrant for the apartment was valid because the description of the vicinity to be searched was clear and the affidavit referenced Landmark Apartment records as well as other information law enforcement had gathered to support that Hopkins lived in apartment 27A—as the affidavit and warrant specifically indicated.

We agree with the circuit court on all points, including the finding that probable cause existed to indicate Hopkins lived in apartment 27A. The supporting affidavit for the search warrant states LCSD confirmed the phone number connected to the attempted sale of the "hot" firearm was the same number Hopkins provided on his paperwork for Landmark Apartments. This information provided a substantial basis for concluding probable cause existed because it gave rise to a fair probability that Hopkins lived in the identified unit. Moreover, the property manager confirmed Hopkins had been living in 27A and that he had recently completed the paperwork to assume his half-brother's lease. The night before the search, LCSD again confirmed this information with the Landmark office. The circuit court correctly declined to suppress the evidence gathered at the Hopkins apartment.

**Conclusion**

Based on the foregoing, Hopkins's convictions and sentences are

**AFFIRMED.**

**KONDUROS and VINSON, JJ., concur.**